[No. 22338-4-II. Division Two. November 10, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. DAVID WAYNE KUNZE, *Appellant*.

*John Henry Browne* of *Browne & Ressler*; and *Rita Joan Griffith* of *Griffith & Cole, P.C.*, for appellant.

*Arthur D. Curtis, Prosecuting Attorney*, and *Dennis Hunter, Deputy*, for respondent.

MORGAN, J. — David Wayne Kunze appeals his convictions for aggravated murder and other crimes. The principal issue is whether the State's witnesses could opine, based on the relationship among some of the anatomical features of the external ear, that Kunze was the probable and likely source of a latent earprint discovered at the scene. Other issues are whether two police officers could opine that the crime scene might have been staged to look like a burglary, and whether the trial court properly restricted the cross-examination of a jailhouse informant. We reverse and remand for new trial.

In the early morning hours of December 16, 1994, an intruder[1] entered the Clark County home of James McCann. McCann was asleep in the master bedroom. His son Tyler, age 13, was asleep in another bedroom. The intruder

---

[1]There may have been more than one intruder. For convenience, we refer to only one.

834

bludgeoned McCann in the head with a blunt object, causing his death. The intruder also bludgeoned Tyler in the head, causing a fractured skull. When the intruder left, Tyler crawled out to the front porch, where he was found after daylight by a passerby.

While awaiting surgery at the hospital, Tyler told the police that he had been afraid to look at his attacker closely. He thought, however, that the attacker was a darkly complected male, possibly Puerto Rican, about six feet tall with medium build, dark or black hair to mid-ear, 25 to 30 years of age, and a deep voice. Tyler later recalled that the attacker wore gloves but not glasses, and had a flashlight in his mouth. Kunze is in his mid-forties, wears glasses, and has reddish-blond hair.

Back at the house, the police observed that the intruder had opened drawers and cabinets without disturbing the contents. They also found that the intruder had taken a TV, a VCR, stereo speakers, a "boom box," McCann's wallet containing identification and credit cards, McCann's truck, and various other items.

George Millar, a fingerprint technician with the Washington State Crime Laboratory, processed the home for evidence. He discovered a partial latent earprint on the hallway-side surface of McCann's bedroom door. He "dusted" the print by applying black fingerprint powder with a fiberglass brush. He "lifted" the print by applying palm-print tape first to the door and then to a palm-print card. The resulting print showed the antitragus and portions of the tragus, helix, helix rim, and antihelix. The external features of a complete ear are shown in the following diagram.[2]

---

[2]This diagram is Exhibit 4 to the State's Offer of Proof and Memorandum of Law Re: Ear and Cheek Impression Evidence, Clerk's Papers at 352.

The police were immediately interested in Kunze, notwithstanding Tyler's description of the intruder. Kunze had been married to Diana James from 1976 to April 1994. On December 12, 1994, four days before the intruder entered McCann's home, James told Kunze that she and McCann were planning to be married. Kunze was upset by the news, according to his own later statement.

The police interviewed Kunze several times. They also searched, with his consent, his truck, house, boat, storage locker, and safety deposit box. The searches did not disclose anything significant, with the possible exception of a receipt for a flashlight.

On or about March 28, 1995, Michael Grubb, a criminologist with the Washington State Crime Laboratory, compared the latent print from McCann's bedroom door with photos of the left side of Kunze's face. He concluded that the latent print "could have been made by Dave Kunze."[3] He also thought that "[i]t may be possible to obtain additional information by comparing the [latent print] to exemplar impressions."[4]

---

[3]Clerk's Papers at 355.

[4]*Id.*

On September 21, 1995, Millar and Grubb met with Kunze to obtain earprint exemplars. Neither had taken an earprint exemplar before, although each had practiced on laboratory staff in preparation for meeting with Kunze. For each of the seven exemplars they took,[5] they had Kunze put hand lotion on his ear[6] and press the ear against a glass surface with a different degree of pressure ("light," "medium," or "hard"). They then dusted the glass with fingerprint powder and used palm-print tape to transfer the resulting impression onto a transparent plastic overlay.

The reason Millar and Grubb took multiple exemplars is that they were consciously trying to produce one that would match (i.e., "duplicate"[7]) the latent print from McCann's door. They knew that earprints of the same ear vary according to the angle and rotation of the head, and also according to the degree of pressure with which the head is pressed against the receiving surface. They did not know the angle and rotation of the head that made the latent print, or the degree of pressure with which that head had been pressed against McCann's door. Hoping to compensate for these difficulties, they told Kunze to use a different degree of pressure each time ("light," "medium" or "hard"), and they looked at the latent print as they worked.

After Millar and Grubb took the exemplars, they were asked to compare them to the latent print. Millar declined because his laboratory supervisor thought that earprint identification was "out of the expertise of the [crime lab's] latent unit."[8] Grubb went ahead, concluding that "David Kunze is a likely source for the earprint and cheekprint

---

[5]Some of these may have been taken at a later date, but that does not affect our analysis. For convenience, we refer to all of them as if taken at this time.

[6]This was suggested in two articles that Millar had read.

[7]As Grubb later put it, they were "look[ing] at the ear as a tool," and they were "trying to duplicate the use of that ear the same way as it would have been used at the crime scene." Report of Proceedings at 192.

[8]Clerk's Papers at 292.

which were lifted from the outside of the bedroom door at the homicide scene."[9]

In June 1996, the State charged Kunze with aggravated murder, assault, robbery, burglary, and kidnapping. In October 1996, Kunze moved for "a pre-trial order excluding any evidence of earprint identification."[10] In December 1996, the trial court convened a *Frye* hearing at which Grubb and other witnesses were called. *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923). We must understand their testimony in detail in order to resolve the issues on appeal.

Grubb testified to extensive qualifications as a criminalist. He had been working as a criminalist for more than 20 years, and he was currently the manager of the state crime lab's Seattle office. Although he had never before dealt with earprints, he specialized in firearm and toolmark identification, and he had analyzed "impression evidence" of other kinds. He had not seen any data or studies on earprints, or on "how often an ear having the general shape of the questioned print in this case appears in the general human population";[11] he thought, however, that a Dutch policeman named Cor Van der Lugt might have such information. He had used transparent overlays to compare the latent and the exemplars in this case, and such overlays are a generally accepted method of making comparisons.[12] When he compared the latent print with the exemplars taken from Kunze, he emphasized the exemplars taken with "a lighter amount of pressure," because those "more closely approximated . . . the impression from the crime scene."[13] He claimed that latent earprint identification is generally accepted in the scientific community, reasoning

[9]*Id.* at 356.

[10]*Id.* at 285.

[11]Report of Proceedings at 228.

[12]*Id.* at 184-85.

[13]*Id.* at 194. As noted earlier in the text, Grubb did not know the amount of pressure that the intruder had used when making the latent print. *Id.* at 213.

that "the earprint is just another form of impression evidence," and that *other* "impression evidence is generally accepted in the scientific community."[14] He concluded that "Mr. Kunze could be the source of [the latent] impression, and even further, I believe it's likely that the impression from [the] crime scene is Mr. Kunze's ear and cheek print."[15]

Cor Van der Lugt testified to extensive qualifications as a police evidence technician. He had been a Dutch police officer since 1971 and a crime scene officer since 1979. He had trained other crime scene officers for many years. Being interested in the reliability of earprints, he had written "a lot of letters all around the world to people who did something with earprints, but unfortunately . . . didn't get too much of [a] response."[16] He had adopted methods used by Professor Lunga of Germany, "who did [an] investigation as to what parts of the ear look alike between parents and their children";[17] methods used by Mr. Hirschi of Switzerland, who "did an investigation between the relation of the height of defining of an earprint and the body length of the offender";[18] and the methods used by several other people in the eastern part of Germany. He had received over 600 cases "for comparative analysis"[19] and had made an identification to his own satisfaction in "somewhere be-

---

[14]*Id.* at 242.

[15]*Id.* at 194.

[16]*Id.* at 700. The record discloses two readable responses, each apparently secured for purposes of this case. Dr. C. Schott of Germany states in a letter that the use of earprints in criminal proceedings is "fully acknowledged by German and Austrian courts," and that earprints "have the same evidentiary value as the morphology [general shape] of the face, ears, and hands." Ex. 18A, at 2. John Kennerly, a fingerprint officer in England, states in a letter that "[t]he forensic science community in the UK support the view that the external ear has a unique design and comparison of the features and characteristics can lead to a valued opinion in determining personal identity." Ex. 19. Neither statement distinguishes between class characteristics and individualizing ones, or between opinions of nonexclusion and opinions of inclusion.

[17]*Id.* at 700.

[18]*Id.* at 701.

[19]*Id.* at 713-14.

tween 200 and 250 cases."[20] On the basis of "somewhere between 100 and 200 prints,"[21] he had concluded that pressure distortion is not a problem that prevents you from making an identification or a comparison between ears, even though you must "get the same pressure on the ear as the ear that was found on the scene of a crime";[22] the solution, he thought, was merely to take several exemplars under different degrees of pressure, then "pick the one that comes closest" to the latent print.[23] He had been to court in six earprint cases, all in Holland, and the judges in those cases had not been concerned about his methodology; indeed, they had "accepted that you can identify an individual by his earprint."[24] He did not present or refer to any published literature stating that earprint identification was generally accepted in the scientific community. He did, however, testify as follows:

> Q: [D]o you have an opinion as to whether . . . the uniqueness of the human ear as a basis for personal identification is a notion that is generally accepted in the Netherlands and elsewhere amongst those engaged in forensic identification?
>
> A: It is accepted, yes.[25]

Alfred V. Iannarelli testified to extensive qualifications as a law enforcement officer. For 30 years, he had worked as a deputy sheriff in Alameda County, California, as the chief of campus police at California State University at Hayward,

---

[20]*Id.* at 716.

[21]*Id.* at 707.

[22]*Id.* at 708. Speaking to the degree of possible distortion, Van der Lugt said that "the [breadth] of an ear can be up to two and a half millimeters wider, and the length can go up to four millimeters from the original." *Id.* at 706. He later clarified that these numbers were "average figures for distortion. It can be more. It can also be less." *Id.* at 710.

[23]*Id.* at 705. Van der Lugt reiterated this method at trial when he said, "[I]t's obvious you choose the one print that fits the found print the most," then "use that as an overlay." *Id.* at 3100, 3101.

[24]*Id.* at 718.

[25]*Id.* at 728.

and in several other law enforcement positions. Thereafter, he had worked as a consultant on ear identification. He became interested in ears in 1948, and over the next 14 years classified perhaps 7,000 ears from photographs (but not from latent prints). In 1964, he published a book describing his system, which he calls "earology" or the "science of ear identification."[26] In 1989, he published a second edition through a different publisher. He had been prohibited from testifying in a 1985 Florida case called *State v. Polite*[27] on the ground that his system of ear identification was not generally accepted in the scientific community.[28] He had testified without objection in a 1984

[26]*Id.* at 265.

[27]*State v. Polite*, No. 84-525 (14th Judicial Circuit, Fla. Jun. 10, 1985).

[28]In excluding the earprint evidence, the Florida trial judge stated:

The State's witness claims to have made a positive identification of the Defendant by comparing a latent earprint found at the crime scene with a known earprint of the Defendant. This appears to be a case of first impression not only in Florida but also in the United States. There is almost no literature on earprint identification and certainly no case law on this issue of earprint identification to guide the Court. The State has offered two witnesses as "experts" to support the admissibility of the earprint identification. The Court finds that one of the State's witnesses, Alfred V. Iannarelli, is not to be recognized as an expert by the Court in determining the admissibility of this evidence.

The Court notes that there were no true scientific tests performed in making the earprint identification. This identification was performed strictly as a comparison test between a known earprint and a latent earprint. The State bases its data on the alleged uniqueness of ears between individuals to establish the reliability of the results of this type of identification. Forensic anthropologists recognize the possible uniqueness of an individual's ears but not as a means of identification.

The testimony presented to the Court suggests that there is a significant difference between comparing actual ears and photographs of ears and the comparing of earprints to each other. Earprints are impressions of an ear. The evidence shows that the ear is a three dimensional object and is malleable. There are no friction ridges as in fingerprints. Different pressures may cause different results with the same ear or different ears to have similar earprints. Furthermore, there are no studies concerning the comparisons of earprints to establish their reliability and validity as a means of identification. The reliability and validity of the results of comparisons of earprints are not recognized or accepted among scientists. There appears to be no science, as in odontology, existing at this time which makes the comparison of earprints possible due to the alleged uniqueness of an individual's ear characteristics.

California murder case called *People v. Anzillotti.*[29] He did not know of any published scientific studies confirming his theory that individuals can be identified using earprints, and he did not claim that his system was generally accepted in the scientific community. On the contrary, he testified:

Q: Are you aware of any scientific research at all that would confirm your theory that ears are so unique that individuals can be positively identified by comparing known earprints with latent ear impressions?

A. Ear photographs, not earprints. Counsel, this is relatively a new science.[30]

His personal belief was that human ears are sufficiently unique to support a positive identification in an appropriate case, and that the latent print left on McCann's door "matche[d] exactly" the exemplars taken from Kunze.[31] The 1989 edition of Iannarelli's book was introduced along with his oral testimony. Titled "Ear Identification," it is published by the Paramont Publishing Company of Fremont, California. It contains no bibliography and no scientific verification.

Dr. Ellis Kerley testified to extensive qualifications as a physical anthropologist. He has a doctorate in anthropology from the University of Michigan and was for many years a professor of that subject. He has taught the anatomy of the human ear. He formerly was President of the American Academy of Forensic Sciences, and President and First Diplomate of the American Board of Forensic Anthropology. He has worked on cases such as the assassination of

Furthermore, the comparison techniques used in this case are not sufficiently established to be deemed reliable. The comparison of earprints has not passed from the stage of experimentation and uncertainty to that of reasonable demonstrability.

Clerk's Papers at 1073-74.

[29]This case did not result in a published appellate opinion.

[30]Report of Proceedings at 304.

[31]*Id.* at 309.

President John F. Kennedy.[32] He thought that the human ear is probably different for each person, but he had "no information" indicating whether one ear can be differentiated from another by observing the ear's gross external anatomy.[33] He did not "consider Mr. Iannarelli's work scientific"; on the contrary, it was "narrative," not "reported in a scientific manner," and "not subjected to any statistical analysis."[34] He rejected Van der Lugt's approach of "apply[ing] pressure until you can make the [exemplar] prints look about the same" as the latent print in issue;[35] as he put it, "we don't do that in science . . . [b]ecause we're not trying to make them look alike."[36] He stated that earprint identification "has not been presented in generally scientific sessions or publications,"[37] and that he was not "aware of any scientific research or authoritative literature . . . concerning earprint identification[.]"[38] It was his opinion that earprint identification has *not* achieved "general acceptance" in the forensic science community.[39]

Professor Andre Moenssens testified to extensive qualifications as a fingerprint examiner and law professor. He began his career as a criminalist in Belgium. He holds a J.D., and an LL.M. in scientific evidence. He teaches scientific evidence and has published numerous books on that subject. He testified in part:

Q: [D]o you have an opinion whether or not earprint identification is generally accepted as reliable in the forensic science community?

[32]*Id.* at 742-43.

[33]*Id.* at 781. He also said that it has not been established, as a generally accepted principle, that no two ears are alike. *Id.* at 757.

[34]*Id.* at 752.

[35]*Id.* at 759.

[36]*Id.* at 787-88. *See also id.* at 759 ("from a scientific point of view, we don't try to make things look the same . . . we try to document similarities or differences without affecting the materials examined").

[37]*Id.* at 757.

[38]*Id.* at 748.

[39]*Id.* at 757.

A: [T]he forensic sciences . . . do not recognize as a separate discipline the identification of ear impressions. There are some people in the forensic science community, the broader forensic science community, who feel that it can be done. But if we are talking about a general acceptance by scientists, there is no such general acceptance.

Q: Is there any evidence that earprint identification has ever been tested by scientific methodology?

A: To my knowledge, it has not been.

Q: Or adequately subjected to scientific peer review?

A: If by peer review, you mean inquiry and verification and studies to confirm or deny the existence of the underlying premise, that is, ear uniqueness, to my knowledge that has not been done.

. . . .

Q: With respect to earprint identification, has it ever been shown that results can be reliably obtained in terms of an acceptable rate of error?

A: To my knowledge, there has been no investigation in the possible rate of error that comparisons between known and unknown ear samples might produce. [40]

While he agreed that one earprint can always be compared with another, he noted that "[t]he question is whether that comparison means anything."[41] He did not know of any generally accepted methods for recording ear characteristics or determining the significance of a "match."[42]

George Bonebrake testified to extensive qualifications as a latent fingerprint examiner. He worked for the FBI from 1941 to 1978, when he retired and became a private finger-

---

[40]*Id.* at 812-15.

[41]*Id.* at 818.

[42]Clerk's Papers at 299.

print consultant. During his last three years with the FBI, he was in charge of its latent print section, supervising 100 examiners and 65 support people. He never identified anyone based on earprints, and to his knowledge no one else at the FBI did either. He testified:

Q: Is there anything in the materials that you have read that indicates earprint identification has been generally accepted in the forensic science community?

A: No, sir.

Q: What is your impression of the state of earprint identification at this point in forensic science history?

A: That there have been a few cases of individuals making earprint comparisons and identifications, but I'm not aware of any study or research that would indicate to me the uniqueness of earprints when it comes to the comparison of [known] earprint impressions . . . with the latent earprint impressions; that's based on class characteristics.

. . . .

Q: Does the literature indicate that there are problems in attempting to obtain earprint exemplars?

A: Especially when it comes to pressure, yes, sir.

. . . .

Q: Have you ever seen any authoritative text published in any discipline of forensic science that's gone on record claiming that earprint identification is generally accepted in the forensic science community?

A: No, sir.[43]

In his professional opinion, the latent print from McCann's door "is of poor quality," shows only class characteristics, and shows nothing unique.[44]

Tommy Moorefield testified that he was a fingerprint

[43]Report of Proceedings at 907-09.

[44]*Id.* at 919.

specialist with the FBI in Washington, D.C. He had worked for the FBI for 36 years as of December 1996. He had conducted advanced latent fingerprint courses throughout the United States, instructed new agents on collecting and preserving evidence, and worked on both the Waco disaster and the TWA Flight 800 disaster. He had once made an identification from a lip print, but he had never made an identification from an earprint. He was "not real sure" that earprint identification is generally accepted in the community of forensic scientists,[45] and he was unaware of the FBI collecting any data on earprints.

William Stokes testified that he was a special agent and chief of all photographic operations for the FBI in Washington, D.C. He had identified individuals from photographs of their ears, but not from latent earprints. He had "no knowledge" of whether latent earprint identification is generally accepted by the scientific community.[46]

Ralph Turbyfill testified that he is the long-time chief latent fingerprint examiner for the Arkansas State Crime Laboratory. He was able to identify a person from an earprint in one case, because of hair follicles that were peculiarly located. He had tried, unsuccessfully, to identify people from earprints in two other cases. He did not believe that earprint identification is generally accepted in the forensic science community, and he did not know of any publication or treatise that so claims.

Gary Siebenthal testified that he had been an officer with the Peoria, Illinois, police department for 23 years and a crime scene technician for 20 of those years. Although he had identified a defendant from an earprint on one occasion, he did not know of anyone who had "proclaim[ed] that earprint identification is generally accepted as reliable in the forensic science community."[47] Nor did he know of any scientific research on reliable techniques for making earprints or dealing with pressure distortion.

[45]*Id.* at 602.

[46]*Id.* at 619.

[47]*Id.* at 502-03.

Paul Norkus was a long-time latent print analyst from Pensacola, Florida. He had been involved in the 1985 case, *State v. Polite*,[48] in which Iannarelli had also been involved. Although he and Iannarelli thought they had made an earprint identification in that case, the trial court ruled that earprint identification was not generally accepted in the scientific community; thus, they were not allowed to testify. He did not believe that the FBI classifies or even keeps a file of earprints, and he had no "idea how often a given general ear shape occurs in the general population."[49] Except possibly for a 1949 article by a Russian author, he did not know of any publications stating "that earprint identification is generally accepted in the forensic science community[.]"[50]

Ernest Hamm testified that he had been a crime laboratory analyst-supervisor in Jacksonville, Florida, for approximately 16 years. He had made an earprint identification in one case. He had been able to do that because the defendant "had a very peculiar mark in the lobe area of the ear."[51] Although he personally believed that earprints can be identified, he knew of nothing to indicate that earprint identification is generally accepted in the forensic science community.

William Sherlock testified that he had worked in law enforcement for more than 30 years. In part, he had trained others to identify tool marks. He had been involved in several earprint cases, but none had gone to trial and he had never testified on earprint identification. "The limited amount of people [he had] talked to . . . don't really have an opinion" on whether earprint evidence is generally accepted as reliable in the forensic science community.[52]

John Olenik testified that he had worked for the Ohio

[48]Clerk's Papers at 801-1074.

[49]Report of Proceedings at 412-13.

[50]*Id.* at 420.

[51]*Id.* at 532.

[52]*Id.* at 655.

Bureau of Criminal Identification and Investigation for 27 years before starting his own business. He was a past president of the Ohio Identification Officers' Association and had published several articles. He had been involved in two earprint cases, neither of which had gone to trial, so he had never testified on earprints. Although he personally believed that earprints could be reliably compared, he did not know of any publications stating that earprint identification is generally accepted in the scientific community.

Roy Gourley testified that he was a detective from Sonoma County, California. Like Iannarelli, he had worked on the 1984 murder case of *People v. Anzillotti*. Because an earprint had been found in that case, he sought information on earprints from the FBI's latent print section in Washington D.C. He was told that the FBI had no experience with earprints and that he should contact Iannarelli. Iannarelli compared the latent print, found that it was the defendant's, and testified as a witness at trial—without objection from the defense.[53] Gourley was not asked whether earprint identification evidence is generally accepted in the scientific community.

At the end of the hearing, the trial court entered written findings of fact and conclusions of law. It concluded that "the principle . . . known as 'individualization' through the use of transparent overlay, applied to the comparison of the latent impression in the present case with the known standards of the defendant, is based upon principles and methods which are sufficiently established to have gained general acceptance in the relevant scientific community."[54] As a result, it admitted the earprint evidence.

Trial commenced on June 25, 1997. The State called Grubb and Van der Lugt, but not Iannarelli, to compare the latent print to the exemplars and to opine about the significance of the comparison. Grubb testified that the latent print showed "the antihelix, the interior portion of

---

[53]Apparently, the defendant's bloody fingerprint was found at the scene, and the victim's blood was found on items in the defendant's car.

[54]Conclusion of Law 6.

the ear; the helix rim, that is the top of the rim of the ear; tragus and antitragus, two portions of the ear down below"; that he had compared those anatomical features using transparencies; and that he had found "very good correspondence of those features."[55] He opined, to a reasonable degree of scientific certainty, that "Mr. Kunze's left ear and cheek [were] the likely source of this [earprint] impression at the [crime] scene."[56]

Van der Lugt testified that he also compared the latent earprint and the exemplars by using transparencies. He found "a few parts that correspond completely,"[57] but also some "differences."[58] He believed that the differences were insignificant, because "[y]ou will never find . . . a 100 percent fit"[59] and "any dissimilarities" were caused "by pressure distortion."[60] Although he conceded that "no study has ever been published in the world that could tell the jury how much correspondence is actually required in order to declare a match,"[61] he also opined:

Q: Mr. Van der Lugt, as a result of your comparison of the Grubb standards and your independent comparison of your own standards with the crime scene tracing earprint that was taken in this case, do you have an opinion as to the probability that the defendant's left ear is the source of the latent impression which was left at the scene of the crime in this case?

A: I do have an opinion, yes.

Q: What is your opinion, then?

A: I think it's probable that it's the defendant's ear is the one that was found on the scene.

---

[55]Report of Proceedings at 2307.

[56]*Id.* at 2305.

[57]*Id.* at 2464.

[58]*Id.* at 2527.

[59]*Id.* at 2526-27.

[60]*Id.* at 2506.

[61]*Id.* at 2527.

. . . .

Q: [H]ow confident are you of the opinion that you just expressed?

A: I'm 100 percent confident with that opinion.[62]

Kunze was convicted of aggravated murder, burglary and robbery. He was sentenced to life without possibility of parole on the murder conviction, and to standard range sentences on the other convictions. This appeal timely followed.

## I

The main question on appeal is whether Grubb and Van der Lugt could properly opine, based on the similarities and differences that they observed in the overlays, that Kunze was the likely or probable maker of the latent print. Kunze says they could not, because they were relying on scientific, technical or specialized knowledge not generally accepted in the relevant scientific, technical or specialized community. The State says they could, either because they were not relying on scientific, technical or specialized knowledge, or because they were relying on scientific, technical or specialized knowledge that was generally accepted in the relevant scientific, technical or specialized community. We inquire (A) whether Grubb and Van der Lugt were relying on scientific, technical or specialized knowledge, and (B), if so, whether that knowledge was generally accepted in the relevant scientific, technical or specialized community.

## A

█ Grubb's and Van der Lugt's testimony was in opinion

---

[62]*Id.* at 2478-79. *See also id.* at 2447, 3123-24. Kunze claims that Van der Lugt's last answer violated one of the trial court's orders in limine, and that the trial court erred by not granting a mistrial. We need not reach that claim, because the problem should not recur on retrial.

form.[63] An opinion is admissible only if it has a rational basis, which is the same as to say that the opinion must be based on *knowledge*.[64] The knowledge may be personal, or it may be scientific, technical or specialized.[65] So-called "lay" opinion is simply opinion based on personal knowledge (i.e., on knowledge derived from the witness' own perceptions, and from which a reasonable lay person could rationally infer the subject matter of the offered opinion).[66] So-called "expert" opinion is simply opinion based in whole or in part on scientific, technical or specialized knowledge.[67] At least in some instances, there is no meaningful distinction between scientific knowledge on the one hand and technical or specialized knowledge on the other.[68]

To comprehend how these rules apply here, we must understand that forensic science differs fundamentally from other kinds of science. As one writer has put it, "[f]orensic identification science has selected for itself—or had thrust upon it—a project that is unknown to other fields: the unique identification or, more properly, individualiza-

---

[63]*See* ER 701 (dealing with lay testimony "in the form of opinions or inferences"); ER 702 (dealing with expert testimony "in the form of an opinion or otherwise").

[64]*See* ER 701; ER 702; *Riccobono v. Pierce County*, 92 Wn. App. 254, 267-68, 966 P.2d 327 (1998).

[65]*Compare* ER 701 *with* ER 702. *See also* FED. R. EVID. 701 advisory committee's note, 56 F.R.D. 183, 281 (FED. R. EVID. 701's requirement that lay opinion be "rationally based on the perception of the witness" is "the familiar requirement of first-hand knowledge or observation").

[66]ER 701; FED. R. EVID. 701 advisory committee's note, 56 F.R.D. 183, 281; (requirement that lay opinion be "rationally based on the perception of the witness" is "the familiar requirement of first-hand knowledge or observation"); Washington's comment to ER 701 (under ER 701, "[t]he emphasis belongs on what the witness knows and not on how he is expressing himself"); *State v. Carlson*, 80 Wn. App. 116, 124, 906 P.2d 999 (1995).

[67]ER 702. When an expert desires to apply scientific knowledge to the facts of the particular case, his or her opinion must also, of course, rest on appropriate case-related facts. See ER 703; *Riccobono*, 92 Wn. App. at 267-68; FED. R. EVID. 703 advisory committee's note, 56 F.R.D. 183, 283.

[68]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999).

tion of various objects, including persons . . . ."[69] Accordingly:

> The goal of individualization contrasts with conventional science of virtually every kind. "Individualization is unique to forensic science." Normal science is concerned with grouping objects and events into meaningful classes, discovering systematic relationships among these classes, and developing and testing theoretical explanations for those shared attributes and relationships. While normal science looks only *between* classes, forensic identification science . . . looks *within* classes. While normal science is concerned with *establishing regularities*, forensic science is concerned with *exploiting irregularities* . . . .[70]

Because of this atypical goal, forensic science is dependent on the existence and identification of *individualizing* characteristics, as opposed to *class* characteristics. An individualizing characteristic is one that shows an object to be unique, or, in alternative terms, one that distinguishes the object from all other objects; it "may be a single feature viewed alone, or an ensemble of features viewed in combination."[71] A class characteristic merely "separate[s] a group of objects from a universe of diverse objects."[72]

A forensic scientist must respect this difference between individualizing and class characteristics when opining about the maker of a latent print. On the basis of class characteristics alone, a forensic scientist can say that a suspect "cannot be excluded" as the maker of a latent print, that the suspect "could have made" a latent print, or that a latent print is "consistent with" exemplars. On

---

[69]Michael J. Saks, *Merlin and Solomon: Lessons from the Law's Formative Encounters with Forensic Identification Science*, 49 HASTINGS L.J. 1069, 1081 (1998); *see also* Harold Tuthill, INDIVIDUALIZATION: PRINCIPLES AND PROCEDURES IN CRIMINALISTICS 16 (1994) ("Criminalistics is the science of individualization.").

[70]Saks, *supra*, at 1082 (citations omitted) (emphasis added).

[71]John I. Thornton, *The General Assumptions and Rationale of Forensic Identification: Evaluation of Source*, § 20-21, *in* MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY (David L. Faigman et al. eds., 1997).

[72]*Id.*

the basis of individualizing characteristics—and *only* on the basis of individualizing characteristics—a forensic scientist can say that a suspect made or probably made a latent print.

Here, Grubb and Van der Lugt claimed that Kunze probably made the latent print taken from McCann's door. As a result, they were necessarily claiming that they had found, and were relying on, at least one individualizing characteristic.

According to the record, Grubb or Van der Lugt lacked *personal* knowledge of any individualizing characteristic. They could not have observed an individualizing characteristic like a scar, tear, mole, or abnormal hair follicle, because the overlays did not show any such feature.[73] They were able to observe the antitragus, tragus, helix, helix rim, and antihelix, insofar as shown in the latent print, but each of those features was a *class* characteristic, not an individualizing one. They were able to observe the *relationship* between the antitragus, tragus, helix, helix rim, and antihelix, insofar as it was shown in the latent print, but a lay person using common knowledge would have had no idea whether such relationship was an individualizing characteristic; to conclude that it was, Grubb and Van der Lugt necessarily had to be employing scientific, technical or specialized knowledge. We turn, then, to whether that knowledge was generally accepted in the relevant community.

## B

 Washington follows *Frye*.[74] *Frye* provides that novel

---

[73]Because of this proposition, the State's reliance on *People v. Marx*, 54 Cal. App. 3d 100, 126 Cal. Rptr. 350, 77 A.L.R.3D 1108 (1975), is misplaced. *Marx* was a murder case with bite mark evidence. When the appellate court and the trial court looked at the evidence, they could see "the extent to which the purported bite marks [on the victim's body] appear to conform generally to *obvious irregularities in defendant's teeth.*" 126 Cal. Rptr. at 356 (emphasis added). As a result of these readily discernable irregularities, the evidence showed one or more individualizing characteristics.

[74]*Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923); *State v. Copeland*, 130 Wn.2d 244, 255, 922 P.2d 1304 (1996); *State v. Jones*, 130 Wn.2d

scientific, technical or other specialized knowledge may be admitted or relied upon only if generally accepted as reliable by the relevant scientific, technical or specialized community.[75] General acceptance may be found from testimony that asserts it,[76] from articles and publications,[77] from widespread use in the community,[78] or from the holdings of other courts.[79] General acceptance may not be found "[i]f there is a significant dispute between qualified experts as to the validity of scientific evidence."[80] When general acceptance is reasonably disputed, it must be shown, by a preponderance of the evidence,[81] at a hearing held under ER 104(a).[82] When

302, 307, 922 P.2d 806 (1996); *State v. Cannon*, 130 Wn.2d 313, 325, 922 P.2d 1293 (1996).

[75]*State v. Greene*, 139 Wn.2d 64, 70, 984 P.2d 1024, 1027 (1999); *Copeland*, 130 Wn.2d at 255; *Jones*, 130 Wn.2d at 306; *Reese v. Stroh*, 128 Wn.2d 300, 306, 907 P.2d 282 (1995); *State v. Russell*, 125 Wn.2d 24, 40, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995); *State v. Riker*, 123 Wn.2d 351, 359, 869 P.2d 43 (1994); *State v. Janes*, 121 Wn.2d 220, 232, 850 P.2d 495, 22 A.L.R.5th 921 (1993); *State v. Cauthron*, 120 Wn.2d 879, 886, 846 P.2d 502 (1993); *State v. Ortiz*, 119 Wn.2d 294, 310-11, 831 P.2d 1060 (1992); *State v. Lord*, 117 Wn.2d 829, 850, 822 P.2d 177 (1991); *State v. Martin*, 101 Wn.2d 713, 719, 684 P.2d 651 (1984) (citing *Frye*, 293 F. at 1014).

[76]*Greene*, 139 Wn.2d at 72; *Cauthron*, 120 Wn.2d at 896; *Lord*, 117 Wn.2d at 851.

[77]*Greene*, 139 Wn.2d at 72; *Copeland*, 130 Wn.2d at 255-56; *Jones*, 130 Wn.2d at 307; *Cauthron*, 120 Wn.2d at 888; *State v. Black*, 109 Wn.2d 336, 342-43, 745 P.2d 12 (1987); *Martin*, 101 Wn.2d at 721-22; *State v. Hayden*, 90 Wn. App. 100, 109, 950 P.2d 1024 (1998).

[78]*State v. Noltie*, 116 Wn.2d 831, 851, 809 P.2d 190 (1991); *Hayden*, 90 Wn. App. at 106. Such use can be the subject of judicial notice when not subject to reasonable dispute. ER 201(b).

[79]*Jones*, 130 Wn.2d at 307; *Cauthron*, 120 Wn.2d at 888; *Martin*, 101 Wn.2d at 721-22; *State v. Cissne*, 72 Wn. App. 677, 680-84, 865 P.2d 564, *review denied*, 124 Wn.2d 1006 (1994). We do not intend the statement in the text to be exclusive. We leave open the possibility that general acceptance can be found in other ways also.

[80]*Cauthron*, 120 Wn.2d at 887; *see also Greene*, 139 Wn.2d at 70; *Jones*, 130 Wn.2d at 307; *State v. Buckner*, 125 Wn.2d 915, 917, 890 P.2d 460 (1995); *Russell*, 125 Wn.2d at 41-42; *Hayden*, 90 Wn. App. at 109.

[81]*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *Bourjaily v. United States*, 483 U.S. 171, 175-76, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987); *Carlson*, 80 Wn. App. at 125.

[82]*Daubert*, 509 U.S. at 592; *Carlson*, 80 Wn. App. at 125. ER 104(a) provides, "Preliminary questions concerning the qualification of a person to be a witness,

general acceptance cannot be reasonably disputed, it may be judicially noticed in the same way as any other adjudicative fact.[83] We review "de novo,"[84] which means without deference.[85]

■ In this case, twelve long-time members of the forensic science community stated or implied that latent earprint identification is not *generally* accepted in the forensic science community. Kerley, Moenssens, and Bonebrake expressly said it was not. Turbyfill said he *believed* it was not. Moorefield, Stokes, Siebenthal, Norkus, Hamm, Sherlock, and Olenik each testified to a lack of information or a lack of opinion—but if the forensic science community had *generally* accepted latent earprint identification, each of them surely would have known about it. Bonebrake, Moorefield, Stokes and Norkus testified that the FBI does not use latent earprint identification—which the FBI would surely do if the forensic science community had generally accepted latent earprint identification. Even Iannarelli, perhaps the foremost American advocate of earprint identification, declined to assert that *latent* earprint identification has been *generally* accepted; he relied instead on his own personal belief.

Grubb asserted general acceptance, but not on tenable grounds. He reasoned, essentially, that latent earprints are a form of impression evidence; that *other* forms of impression evidence are generally accepted in the forensic science community; and thus that latent earprints must be gener-

the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of section (b). In making its determination it is not bound by the Rules of Evidence except those with respect to privileges."

[83]ER 201(b); *City of Bellevue v. Lightfoot*, 75 Wn. App. 214, 222, 877 P.2d 247 (1994), *review denied*, 125 Wn.2d 1025 (1995); *see Lord*, 117 Wn.2d at 852 ("general acceptability of microscopes is unquestionable").

[84]*Copeland*, 130 Wn.2d at 255; *Jones*, 130 Wn.2d at 307; *Cauthron*, 120 Wn.2d at 887; *Carlson*, 80 Wn. App. at 125.

[85]*Jones*, 130 Wn.2d at 307; *Cauthron*, 120 Wn.2d at 887; *Carlson*, 80 Wn. App. at 125. *Compare General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S. Ct. 512, 517, 139 L. Ed. 2d 508 (1997) (federal appellate courts review for abuse of discretion).

ally accepted in the forensic science community.[86] We reject his premise that latent earprints automatically have the same degree of acceptance and reliability as fingerprints, toolmarks, ballistics, handwriting, and other diverse forms of impression evidence.

Like Iannarelli, Van der Lugt may not have asserted *general* acceptance.[87] Even assuming he did, however, his assertion cannot by itself show general acceptance by a preponderance of the evidence. As we noted above, general acceptance may not be found "[i]f there is a significant dispute between qualified experts as to the validity of scientific evidence."[88] At the very least, this record shows such a dispute. Accordingly, we hold that latent earprint identification is not generally accepted in the forensic science community.

Nothing in our holding bars testimony at retrial concerning how the latent print was lifted, how the exemplars were taken, or how the overlays were prepared. As the State correctly argues in its brief, "[t]here is nothing novel or scientific about lifting or taking a print whether it be of an ear, a lip or a.finger," and nothing "novel or scientific about taking the print and putting it on an overlay."[89] Lifting prints and preparing overlays involves technical or other specialized knowledge, but that knowledge has been generally accepted for decades.[90]

Nothing in our holding bars testimony at retrial concern-

---

[86]*See* Report of Proceedings at 242.

[87]When asked "whether the uniqueness of the human ear as a basis for personal identification . . . is *generally* accepted in [t]he Netherlands and elsewhere among those engaged in forensic identification," Van der Lugt answered, "It is accepted, yes." *Id.* at 728 (emphasis added). He did not say "*generally* accepted," and we have no way of knowing whether the omission was intentional or inadvertent. He also did not say where "elsewhere" was, and it seems unlikely, in light of the testimony given by other witnesses, that he meant to include the United States of America.

[88]*Cauthron*, 120 Wn.2d at 887.

[89]Br. of Resp't at 48.

[90]We do not overlook pressure distortion, but we think that its effects on "lifting" an earprint (as opposed to "matching" the print with another one, or determining the significance of a "match") go to weight rather than admissibility.

ing visible similarities and differences between the latent print and the exemplars. This type of comparison—an "eyeballing" of readily discernable similarities and differences—is based on "visual techniques" that "present jury questions,"[91] or, in alternative terms, on personal knowledge that can readily be understood and evaluated by the jury.[92] Thus, it need not be supported by a showing of general acceptance.

Finally, nothing in our holding bars testimony, based on an appropriate comparison of the latent print with the exemplars, that Kunze cannot be excluded as the maker of the latent print. An opinion of nonexclusion (e.g., that a particular person cannot be excluded as the maker of a latent print) can rationally be based on readily discernable class characteristics, but an opinion of inclusion (e.g., that a particular person made or probably made a latent print) cannot be.[93]

In reaching our holding, we do not overlook the trial court's Finding 15, on which the State heavily relies. In that finding, the trial court stated that "the explanatory principle of 'individualization,' that any two items that have a common origin can be compared and an individualization accomplished if the items [are] of a quality that the individuality can be observed, is generally accepted in the branch of forensic science known as criminalistics."[94] This finding is immaterial here, where the question is whether

The ordinary juror knows that the human ear is malleable, and he or she can readily understand, especially when aided by cross-examination, that malleability might skew a latent print.

[91]Br. of Resp't at 50.

[92]*Ortiz*, 119 Wn.2d at 311. We do not overlook pressure distortion, but we think that its effects on this type of "eyeball comparison" (as opposed to its effects on declaring the significance of the comparison) go to weight rather than admissibility. Aided by cross-examination, the ordinary juror can readily understand that malleability may affect a comparison of similarities and differences.

[93]Of course, Kunze may challenge in front of the jury the reliability of any evidence admitted under this or either of the two preceding paragraphs. *See People v. Lewis*, 160 Mich. App. 20, 27, 408 N.W.2d 94, 98 (1987).

[94]Finding of Fact 15, Clerk's Papers at 2435-36.

*latent earprint identification* is generally accepted (or, in alternative terms, whether earprints in general, and the earprints in this case in particular, are "of a quality that the individuality can be observed"). We agree with and adopt the statements of a commentator who, after noting two generally held tenets—"that no two snowflakes are exactly the same," and "that no two fingerprints have ever been found to have the same ridge positioning"—states as follows:

> In some quarters, these tenets have been scooped up and extended into a single, all-encompassing, generalized principle of uniqueness, which states that "Nature never repeats itself."
>
> This principle is probably true, although it would not seem susceptible of rigorous proof. But the general principle cannot be substituted for a systematic and thorough investigation of a physical evidence category. One may posit that no two snowflakes are alike, but it does not immediately follow that no two shoe soles are alike, since snowflakes are made in clouds and shoes are not. If no two shoe soles are alike, the basis for this uniqueness must rest on other grounds, and those grounds must be identified and enunciated.[95]

We conclude that the trial court erred by allowing Grubb and Van der Lugt to testify that Kunze was the likely or probable maker of the latent, and that a new trial is therefore required.

## II

An issue that may arise at retrial is whether the trial court erred by allowing two police officers to testify at trial, over Kunze's objection, that the crime scene had been staged to look like a burglary. Kunze acknowledges that "[t]he officers' experience may have supported a conclusion that the scene did not look like a typical burglary scene."[96]

---

[95]Thornton, *supra*, at § 20-4.2.

[96]Br. of Appellant at 55.

He argues, however, that "atypical . . . does not equal 'staged.' "[97]

Deputy Erin Nolan, a detective with the Clark County Sheriff's Office, testified that she had been at the crime scene. She had observed, among other things, severed phone lines and open drawers and cabinets with undisturbed contents. She thought the scene was unusual, and that it "may have been staged" to look like a burglary.[98] Sergeant Robert Gebo, an investigator with the Seattle Police Department, offered a similar opinion after viewing photos of the scene.

According to the record, Nolan and Gebo merely stated, based on their personal observations of the scene or photos of it, that they thought the scene was unusual and might have been "staged." In light of their personal knowledge and experience, and of the fact that they were testifying to inferences readily understandable by the jury, we think that each one's opinion was supported by a rational basis of knowledge; that the trial court could rationally find that each one's opinion would be helpful to the jury;[99] and thus that the trial court did not abuse its discretion.[100]

## III

Another issue that may arise at retrial is whether the trial court improperly restricted Kunze's cross-examination of a witness named Steve Lawrence. Lawrence testified while he and Kunze were in jail together, Kunze had admit-

[97]Br. of Appellant at 55.

[98]Report of Proceedings at 1934.

[99]*See* ER 701; *Ortiz*, 119 Wn.2d at 311 (testimony of tracker not so technical that jury could not judge reliability for itself); *State v. Halstien*, 122 Wn.2d 109, 128, 857 P.2d 270 (1993) (officer's testimony that substance "appeared to be semen or some other bodily fluid" admissible under ER 701); *State v. Ferguson*, 100 Wn.2d 131, 141, 667 P.2d 68 (1983) (same as *Halstien*); *see also People v. McDonald*, 231 A.D.2d 647, 647 N.Y.S.2d 795, 796, *appeal denied*, 89 N.Y.2d 926 (1996) (officer permitted to testify that murder scene had been staged to look like a burglary).

[100]*See Ashley v. Hall*, 138 Wn.2d 151, 155, 978 P.2d 1055, 1056 (1999) ("ER 701 is a rule of discretion").

ted to perpetrating McCann's murder. Kunze then wanted to impeach Lawrence by showing that Lawrence was presently serving a 10-year prison sentence for two Class A felonies, each of which was a first degree child molestation; that Lawrence had lied under oath on welfare applications; that Lawrence had lied, not under oath, on several employment and rental applications;[101] that Lawrence had lied, not under oath, to his wife about the child molestations; that in 1990 Lawrence had informed on someone else accused of murder; and that Lawrence presently wanted to obtain favorable treatment from the State (e.g., entry into the Twin Rivers treatment program and supervised visits with his children). In response to the State's motion to limit cross-examination, the trial court ruled that Kunze could not show the exact nature of Lawrence's offense (first degree child molestation) or the unsworn lies. It allowed Kunze to show the rest, including that Lawrence was serving a 10-year sentence on two Class A felonies.

Cross-examination "to show bias, prejudice or interest is generally a matter of right,·but the scope or extent of such cross-examination is within the discretion of the trial court."[102] Specific instances of lying may be admitted whether sworn or unsworn, but their admission is highly discretionary under ER 608(b).[103] Although we might have admitted all or most of the instances in which Lawrence

---

[101]On one occasion, apparently, Lawrence said on an employment application that he was employed when he was really on welfare. The record does not show the date on which any of the lies took place, except for one 1996 employment application.

[102]*State v. Roberts*, 25 Wn. App. 830, 834, 611 P.2d 1297 (1980); *see also* ER 611(a), ER 403, ER 608(b).

[103]ER 608(b) provides:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

lied, we cannot say on this record that the trial court abused its discretion.

Reversed and remanded for new trial.

HOUGHTON and HUNT, JJ., concur.

Reconsideration denied December 22, 1999.

Review denied at 140 Wn.2d 1022 (2000).