[No. 29804-0-II. Division Two. October 5, 2004.]

THE STATE OF WASHINGTON, *Respondent*, v. KEVIN MICHAEL PHILLIPS, *Appellant*.

*James L. Reese III*, for appellant.

*Russell D. Hauge, Prosecuting Attorney*, and *Craig P. Lindsay, Deputy*, for respondent.

QUINN-BRINTNALL, C.J. — A jury convicted Kevin Michael Phillips of vehicular homicide and vehicular assault. RCW 46.61.520, .522. One of Phillips's passengers died at the scene and the other was critically injured when the car

Phillips was driving crossed the center line, left the road, and crashed into a telephone pole, shearing the pole in two. On appeal, Phillips challenges the trial court's ruling allowing the State's accident reconstruction expert to testify using computer-assisted reconstruction calculations. We affirm.

## FACTS

On September 29, 2001, Phillips was driving on a rural road in Kitsap County with two passengers, Perry Dieckmann and Joseph Lanning. The speed limit on the road was 40 mph. The weather was clear and the road was dry. At approximately 10:40 P.M., Phillips's car went off the road and collided with a telephone pole. Dieckmann, the front-seat passenger, was critically injured and Lanning, the rear-seat passenger, died at the scene.

Shortly after the accident, Kitsap County Sheriff Deputy Russell Clithero went to the scene to investigate. Clithero noticed that the accident had occurred at a sweeping curve in the road. Clithero observed tire marks on the eastbound lane, which crossed the center line and then went off the road. According to Clithero, where the car left the road, it looked like "a bulldozer [had] . . . cut a path through" the bushes and completely "sheared off" the telephone pole. 4 Report of Proceedings (RP) at 260. Clithero created a diagram based on this evidence to show how the accident had occurred.

On October 23, 2001, Clithero spoke with Phillips at Phillips's attorney's office. Phillips told Clithero that he had been driving along the road at 60 mph when he saw a deer enter the road right in front of him. Phillips said that when he saw the deer, he "slammed on [his] brakes and swerved to the left." 4 RP at 275. According to Phillips, this caused the vehicle to turn, and when he attempted to correct the rotation, the car went off the road. Phillips said that while sliding toward the pole, Dieckmann grabbed the steering wheel and turned it to the right, causing the crash.

On September 25, 2002, the State charged Phillips with one count of vehicular homicide and one count of vehicular assault. During trial, the State presented John Hunter as an expert witness. In analyzing the accident, Hunter used PC-Crash, a software program that performs physics calculations from input data to reconstruct and simulate traffic accidents. Based on Clithero's diagram, Hunter input data into PC-Crash to simulate Phillips's accident. Hunter adjusted the potential speeds of the vehicle, simulating the vehicle's path over the tire track marks, through the bushes, and hitting the pole. Based on his analysis, Hunter testified that Phillips's vehicle was traveling at approximately 80 mph when the accident occurred. Hunter opined that Phillips's failure to negotiate the sweeping curve was due to the vehicle's speed, rather than Phillips's asserted swerving maneuver.

Phillips also presented an expert, Kenneth Cottingham, who was a mechanical engineer. Cottingham testified that the tire marks at the scene were "yaw marks," meaning that "[t]he car [was] going sideways, point[ing] one way and sliding and going another way, [simultaneously] rotating." 6 RP at 530. Cottingham testified that based on the critical speed analysis on the yaw marks, Phillips's vehicle was traveling at 60 mph at the time of the accident. Cottingham also opined that the curve did not put the vehicle "into a yaw" and that the vehicle went into a yaw when Phillips suddenly swerved, as he would have done to avoid hitting a deer. Cottingham testified that once the vehicle went into a yaw, it was "irrevocable." 6 RP at 550.

The jury convicted Phillips on October 9, 2002, and the trial court imposed a standard range sentence of 30 months. On October 21, 2002, Phillips filed motions to arrest judgment and for a new trial. The trial court denied both motions and Phillips appealed.

## ANALYSIS

ACCIDENT RECONSTRUCTION SOFTWARE EVIDENCE

The main question on appeal is whether the trial court committed reversible error by admitting Hunter's accident reconstruction testimony. Hunter used a computer software program called PC-Crash to assist in reconstructing the collision and estimating the speed Phillips's car was traveling when it sheared the telephone pole. Phillips does not challenge Hunter's qualification as an accident reconstruction expert. Instead, he claims that PC-Crash is not generally accepted in the scientific community and, thus, the trial court erred in ruling that the State carried its burden of establishing that testimony from an accident reconstruction expert who used PC-Crash to analyze data was admissible under the *Frye*[1] test.

 Expert testimony is admissible when the witness qualifies as an expert, the opinion is based on an explanatory theory generally recognized in the scientific community, and the testimony would help the trier of fact. *State v. Greene*, 139 Wn.2d 64, 73-74, 984 P.2d 1024 (1999), *cert. denied*, 529 U.S. 1090 (2000). ER 702 also permits admission of qualified expert testimony when scientific, technical, or other specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue. A witness without personal knowledge who fails to satisfy the requirements of ER 702 is merely speculating. Such a witness has no relevant admissible evidence and must be excluded. *Safeco Ins. Co. of Am. v. McGrath*, 63 Wn. App. 170, 177, 817 P.2d 861 (1991), *review denied*, 118 Wn.2d 1010 (1992). Although we review a trial court's decision to admit or exclude expert testimony for an abuse of discretion, a court that admits expert testimony unsupported by an adequate foundation abuses its discretion. *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 683-84, 15 P.3d 115 (2000); *see also State v. Atsbeha*, 142 Wn.2d 904, 918-20, 16 P.3d 626 (2001) (trial court did not abuse its

---

[1] *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923).

discretion in excluding expert testimony that did not meet the requirements of ER 401, 402, or 702).

■■■ In Washington, evidence derived from a novel scientific theory or principle is admissible only if the theory or principle has achieved general acceptance in the relevant scientific community. ER 702; *State v. Copeland*, 130 Wn.2d 244, 261, 922 P.2d 1304 (1996) (affirming Washington's adherence to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), despite United States Supreme Court's adoption of a different test in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)). We review the trial court's decision to admit scientific evidence under the *Frye* standard de novo. *State v. Kunze*, 97 Wn. App. 832, 854, 988 P.2d 977 (1999), *review denied*, 140 Wn.2d 1022 (2000). But if the evidence does not involve a novel scientific theory, a *Frye* hearing is not required. *State v. Hayden*, 90 Wn. App. 100, 104, 950 P.2d 1024 (1998); *see also State v. Vermillion*, 112 Wn. App. 844, 862-63, 51 P.3d 188 (2002) (concluding that evidence from a police tracking device is not subject to a *Frye* analysis), *review denied*, 148 Wn.2d 1022 (2003); *State v. Noltie*, 57 Wn. App. 21, 29-30, 786 P.2d 332 (1990) (concluding that the colposcope is in general use in the medical community and is "no more a 'novel' device or scientific process subject to the *Frye* standard than binoculars or a weak microscope"), *aff'd*, 116 Wn.2d 831, 809 P.2d 190 (1991).

Trial courts routinely admit testimony from qualified accident reconstruction experts. *See, e.g., State v. Hanna*, 123 Wn.2d 704, 707-08, 871 P.2d 135, *cert. denied*, 513 U.S. 919 (1994); *State v. Quiros*, 78 Wn. App. 134, 136, 896 P.2d 91, *review denied*, 127 Wn.2d 1024 (1995); *State v. Reid*, 74 Wn. App. 281, 286, 872 P.2d 1135 (1994). As noted, Phillips does not challenge Hunter's qualifications as an accident reconstruction expert. Instead he claims that because Hunter used PC-Crash, a computerized reconstruction software program, to calculate the speed of the vehicle and reconstruct the crash, it is PC-Crash and not Hunter that is giving evidence and that PC-Crash must meet the *Frye* standard.

Initially, we note that Hunter testified that PC-Crash was not based on a novel scientific theory. He testified that the computer software merely applies the long-accepted laws of physics and computerized accident reconstruction calculations. Hunter testified that reconstruction experts could make the same calculations by hand or on spreadsheets but that PC-Crash's capacity to break down the simulations into 15-millisecond segments made it a more useful tool. As Hunter presented it, PC-Crash is little more than an advanced calculator and the *Frye* standard would not apply. *State v. Russell*, 125 Wn.2d 24, 70, 882 P.2d 747 (1994) (concluding that introduction of certain statistical probability evidence did not implicate *Frye*; computer programs were "nothing more than sophisticated record-keeping systems"), *cert. denied*, 514 U.S. 1129 (1995).

But we do not hold here that computerized accident simulation programs like PC-Crash are exempt from the *Frye* standard, and for purposes of this appeal, we accept the trial court's decision that a *Frye* hearing was required. Thus, we now proceed with a de novo review of the trial court's findings following the *Frye* hearing. *Kunze*, 97 Wn. App. at 854.

■■■■■ First, we determine if the evidence has a valid scientific basis. *State v. Cauthron*, 120 Wn.2d 879, 887, 846 P.2d 502 (1993). Under *Frye*, novel scientific, technical, or other specialized knowledge may be admitted or relied upon only if generally accepted as reliable by the relevant scientific, technical, or specialized community. *Kunze*, 97 Wn. App. at 853. General acceptance may be found "from testimony that asserts it, from articles and publications, from widespread use in the community, or from the holdings of other courts." *Kunze*, 97 Wn. App. at 853 (footnotes omitted). If there is a significant dispute between qualified experts as to the validity of scientific evidence, there is no general acceptance. *Cauthron*, 120 Wn.2d at 887. Mere disagreement as to the conclusions or weight to be given the results, however, does not amount to a significant dispute. *See Russell*, 125 Wn.2d at 51.

Here, the State provided substantial evidence of the acceptance underlying the principles that PC-Crash uses and the general acceptance in the accident reconstruction community of similar software. Hunter, an accident reconstruction expert with 30 years' experience, testified to the use of accident simulation programs such as PC-Crash in the accident reconstruction community. Hunter has used PC-Crash since 1995 or 1996 over a thousand times. And he used PC-Crash in connection with his testimony in one other vehicular homicide trial in Snohomish County and two or three civil trials.[2] Hunter also testified that there are many two-dimensional accident simulation software programs available and that PC-Crash is one of two major three-dimensional software reconstruction programs available.[3]

Hunter also testified about two validation articles on PC-Crash published in accident reconstruction journals, one favorable and the other critical. He testified that the critical review on which Phillips's attorney relied had been discredited and the accident reconstruction community no longer embraces this article's criticism. Specifically, Hunter testified that the article had not been properly peer re-

---

[2] Hunter testified:

Q. How many times have you used PC-Crash to reach a conclusion about a particular collision?

A. I don't know. I mean, thousands. I'm sure well over a thousand times. I've been using the program since '95 or '96 and I use it on a lot of collisions, so . . . I do about 180 crashes a year.

Q. You have had about 20 years of experience as an accident reconstructionist or in that field?

A. In the reconstruction field. I have been doing crashes since the early '70s.

Q. And have the results that you have seen PC-Crash reach been consistent with your experience doing them by hand back before you used PC-Crash?

A. Oh, well, sure. And you can validate it by hand on a simple momentum solution. PC-Crash can give you the results. You can do the hand calculations, they will come out the same, or use a spreadsheet, they will come out the same.

2 RP at 115.

[3] The other three-dimensional software is HVE 3D. Our record does not define this acronym.

viewed; it was his understanding that the article had been withdrawn from publication by the Society of Automotive Engineers; and his review of the critical article suggested that the authors had improperly applied two-dimensional analysis to the three-dimensional PC-Crash program and that this error had created the unreliable results reported in the article.

Hunter testified that several accident reconstruction agencies have or use PC-Crash, including the Society of Automotive Engineers, the Seattle corporation MDE Engineering, and the Washington State Patrol Major Accident Investigation Team. He named other accident reconstruction experts he knew who were using the program and who had used the program results in their testimony in Washington courts.

In evaluating general acceptance in the scientific community, we also look to decisions from other jurisdictions. *State v. Jones*, 130 Wn.2d 302, 307, 922 P.2d 806 (1996). Our inquiry is not whether other courts have accepted the evidence, but whether the scientific community accepts the evidence and whether other jurisdictions have found evidence of widespread use. *Jones*, 130 Wn.2d at 307. There is no published federal or state case in the United States that has specifically ruled on the validity of the PC-Crash software. But other jurisdictions have accepted accident reconstruction software and computer simulations as based on the application of long-standing scientific principles. In *State v. Clark*, 101 Ohio App. 3d 389, 416, 655 N.E.2d 795 (1995), *aff'd*, 75 Ohio St. 3d 412, 662 N.E.2d 362 (1996), the appellate court affirmed the admission of computer reconstructed models based on "the reliability of such simulations within the relevant technical community." The court in *Clark* noted that similar simulations have been found reliable and admissible in other jurisdictions. 101 Ohio App. 3d at 416-17 (citing *Perma Research & Dev. v. Singer Co.*, 542 F.2d 111, 115 (2d Cir. 1976) (results of computer simulation were used to form the basis of expert testimony regarding the feasibility of perfection of an automobile anti-skid

device); *Messex v. La. Dep't of Highways*, 302 So. 2d 40, 44 (La. Ct. App. 1974) (computer simulation of automobile accident was used to assist court in determining whether the defendant had reasonable opportunity to avoid accident); *Holland v. Dick Youngberg Chevrolet-Buick, Inc.*, 348 N.W.2d 770 (Minn. Ct. App. 1984) (computer simulated test was conducted to show a truck could achieve a speed of 55 mph with a full load and was not substantially impaired); *Kudlacek v. Fiat S.p.A.*, 244 Neb. 822, 842-43, 509 N.W.2d 603 (1994) (expert testimony regarding computer simulation of the path of an automobile on a roadway was properly admitted); *People v. McHugh*, 124 Misc. 2d 559, 476 N.Y.S.2d 721 (1984) (computer simulation of car crash was admitted in second degree manslaughter prosecution); *Deffinbaugh v. Ohio Turnpike Comm'n*, 67 Ohio App. 3d 692, 588 N.E.2d 189 (1990) (two computer generated simulations of a car accident were properly admitted at trial)).

Here, the State demonstrated by a preponderance of the evidence that the use of computer-assisted accident reconstruction software, such as PC-Crash, is accepted in the accident reconstruction community. Accident reconstruction software programs and computer simulations have been used in other jurisdictions. Although Phillips offered a copy of one unverified article critical of the PC-Crash reconstruction program, there was testimony that this article had been discredited and may even have been withdrawn from publication.[4] More importantly, there was no evidence that a significant dispute among experts exists regarding the use of computer-assisted accident reconstruction programs.

Computer-assisted accident reconstruction programs, including PC-Crash, calculate from established laws of physics and are sufficiently accepted in the field of accident reconstruction to satisfy the *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), standard for admissibility. An other-

---

[4] No copy of the article is available through the Society of Automotive Engineers which originally published the article. Hunter testified that the reason that the article was not available was that it had been withdrawn.

wise qualified accident reconstruction expert is not prohibited from giving expert opinion testimony on the cause of an accident merely because he uses the assistance of such a software program in making his calculations. Phillips's challenges to the proper use of the software go to the weight not the admissibility of Hunter's expert testimony and the trial court properly admitted Hunter's expert accident reconstruction testimony. *Russell*, 125 Wn.2d at 51.

Affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HOUGHTON and HUNT, JJ., concur.

Review denied at 154 Wn.2d 1014 (2005).