IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Detention of GREGORY S. JAEGER. | ) ) ) | No. 72392-8-I |
| | ) | DIVISION ONE |
| STATE OF WASHINGTON, | ) ) | |
| Respondent, | ) ) | UNPUBLISHED OPINION |
| v. | ) ) | |
| GREGORY S. JAEGER, | ) ) | |
| Appellant. | ) | FILED: September 6, 2016 |

SCHINDLER, J. — Following a three-week trial, a jury found the State proved beyond a reasonable doubt that Gregory S. Jaeger is a sexually violent predator under chapter 71.09 RCW. The trial court entered an order of commitment to the custody of the Department of Social and Health Services. Jaeger argues denial of motions for a mistrial, evidentiary rulings, and misconduct during closing argument requires reversal. Jaeger also challenges his civil commitment on constitutional grounds. We affirm.

FACTS

Gregory S. Jaeger exhibited cognitive and behavioral deficiencies throughout his childhood. Since the age of seven, Jaeger has been diagnosed with attention deficit hyperactivity disorder, pervasive development disorder, bipolar disorder, obsessive-compulsive disorder, general anxiety disorder, fetal alcohol syndrome, and alcohol related neurodevelopmental disorder. A number of mental health providers have

provided treatment to Jaeger. Jaeger was enrolled in special education classes at school.

The State filed charges against 16-year-old Jaeger in juvenile court alleging child molestation and attempted child molestation in the first degree. Jaeger pleaded guilty. The court ordered Jaeger remain at a juvenile rehabilitation administration (JRA) facility until age 21. Shortly before his scheduled release from Maple Lane School, the State filed a petition to civilly commit Jaeger as a sexually violent predator and transferred him to the Department of Social and Health Services Special Commitment Center Program (SCC).

At trial, the State had the burden to prove beyond a reasonable doubt Jaeger "has been convicted of a crime of sexual violence," he "suffers from a mental abnormality or a personality disorder which cause(s) him serious difficulty controlling his sexually violent behavior," and "his mental abnormality or personality disorder makes [him] likely to engage in predatory acts of sexual violence if not confined to a secure facility."[1]

The State called several witnesses including Dr. Harry Hoberman, Paul Luttrell, and Hayley Shepard. Dr. Hoberman was the State's main witness. Dr. Hoberman is a clinical and forensic psychologist specializing in evaluating individuals considered for civil commitment as sexually violent predators.

Dr. Hoberman testified that Jaeger suffers from multiple psychotic conditions affecting his ongoing ability to control his sexual behavior.

> I guess what I would say is Mr. Jaeger is a young man who is characterized by multiple psychiatric conditions, multiple problems.

---

[1] See RCW 71.09.020(18).

They're long-standing problems. They mostly, almost all of them have implications or consequences for his self-control.

They have implications for his ability to manage his behavior generally, as well as his sexual behavior, and lead to his having ongoing problems with both actually acting out and his risk for future sexually acting out.

I think you can think of Mr. Jaeger as someone who has a high level of urges, desires, things of that sort, pushes from inside as well as pulls from his environment that stimulate him. And then someone who lacks brakes, if you will, things to regulate or modulate those things, that he's got really very significant deficits in self-control.

Dr. Hoberman testified that Jaeger has a history of serious problems managing his behavior generally and his sexual behavior. Jaeger would engage in aggressive outbursts at home and in school. Jaeger exhibited sexualized behaviors from a young age including sexual behavior with younger boys and fetishism associated with soiled diapers. With regard to his juvenile conviction, Jaeger used soda pop "as a mechanism . . . to lure" the first victim and crawled under a locked bathroom stall to reach the second victim.

Dr. Hoberman testified that Jaeger struggled to correct his behavior. For example:

[O]ne of the really significant things about Mr. Jaeger is that he really does the same things over and over again. He is verbally aggressive to people, he's physically aggressive to peers, he gets in trouble for it, he gets suspended, he does it again.

Jaeger's problematic behavior continued while detained at the SCC. Jaeger also continued fantasizing about sexual contact with young boys. Dr. Hoberman testified that while at the JRA facility, Jaeger "was marked by a high level of impulsive behaviors generally so that he was aggressive towards residents, [and] he was verbally aggressive in a fairly extreme way to the staff." Jaeger was repeatedly removed from the sex offender treatment program due to "lack of compliance [and] acting out."

3

Dr. Hoberman concluded Jaeger suffers from several mental abnormalities and personality disorders that prevent him from controlling his sexually violent behavior. Dr. Hoberman testified Jaeger suffers from attention deficit hyperactivity disorder and meets the criteria for several personality disorders including borderline personality disorder, antisocial personality disorder, and narcissistic personality disorder. Dr. Hoberman testified these disorders result in impulsivity, disregard for rules and consequences, lack of empathy, and an obsessive desire to fulfill his own needs. Dr. Hoberman diagnosed Jaeger with pedophilic disorder, fetishism, and sexual masochism disorder. Dr. Hoberman testified that in his opinion, Jaeger "is more likely than not to engage in predatory acts of sexual violence if not confined to a secure facility."

Paul Luttrell was Jaeger's case manager for four years at Maple Lane School. During counseling sessions, Jaeger said he began looking at pornography around age 10 and "preferred finding pre-aged school [boys]" because "he found that more arousing for him." Jaeger told Luttrell that he masturbated with diapers because it made him think about having sexual contact with children. Luttrell testified that throughout the four years at the Maple Lane School, Jaeger "would make generalized comments about having fantasies about an attraction to boys." Jaeger told Luttrell that he "was really fearful that he did not have control over his urges; and that, when he returned to the community, he was worried about re-offending."

Jaeger also told a Maple Lane School administrator he was concerned he "would harm children in the community." Jaeger asked the administrator to help civilly commit him.

Jaeger's SCC case manager Hayley Shepard testified Jaeger struggles to follow the rules and exhibits aggressive behavior. Jaeger had problems following staff directives and tearing up his room. Jaeger is "very impulsive" and "struggles to stop and think before he acts." On one occasion, Jaeger attacked a disabled resident confined to a wheelchair. Shepard testified that although Jaeger is "quick to say . . . when he's done something wrong [and] that he will never do it again," he continues to violate the rules.

Shepard testified Jaeger repeatedly engaged in sexual activity with other residents at the SCC. Shepard said Jaeger admitted taking used diapers worn by other SCC residents for masturbation. Jaeger told Shepard that "he felt he wouldn't be able to control that fetish in the community." Jaeger admitted he does not have control over his emotions or behavior.

Jaeger called several witnesses including Dr. Denise Kellaher and Dr. Natalie Brown. Dr. Kellaher testified that Jaeger exhibited an intellectual disability and autism. Dr. Kellaher testified these disorders do not make Jaeger more likely to engage in predatory acts of sexual violence. Dr. Brown testified Jaeger's behavior is consistent with autism and his intellectual and behavioral deficits are consistent with with fetal alcohol spectrum disorder.

The jury found the State proved beyond a reasonable doubt that Jaeger is a sexually violent predator. The trial court entered an order of commitment to the custody of the Department of Social and Health Services at the SCC. Jaeger appeals.

ANALYSIS

Motions for Mistrial

Jaeger argues the trial court erred in denying the motion for mistrial he made during voir dire and after a juror fainted during the opening statement.

The decision to deny a motion for mistrial is within the sound discretion of the trial court and is reviewed for an abuse of discretion. In re Det. of Broten, 130 Wn. App. 326, 336, 122 P.3d 942 (2005). A court abuses its discretion if the decision is based on untenable grounds or manifestly unreasonable. Broten, 130 Wn. App. at 336. The trial court is in the best position to discern prejudice and determine whether a juror can be fair. State v. Noltie, 116 Wn.2d 831, 839-40, 809 P.2d 190 (1991). A mistrial is warranted only when nothing short of a new trial can ensure a fair trial. In re Det. of Griffith, 136 Wn. App. 480, 485, 150 P.3d 577 (2006).

### (1) Motion for Mistrial During Voir Dire

Jaeger contends the response of Juror 61 during voir dire tainted the jury pool and the court erred in denying his motion for a mistrial. We disagree.

The court summoned 100 potential jurors. The jurors completed individual questionnaires prior to voir dire. The court conducted jury voir dire in two sessions with 50 jurors each.

Jaeger's attorney requested the court ask a number of specific questions during voir dire about sex crimes and sex offenders "to get true answers." The trial court agreed to do so.

At the beginning of voir dire, the court explained the importance of giving an honest answer.

> I want to make a comment on why we require you to take the oath. The jury selection process can only work if you are open and candid with us. . . . .
>
> . . . .
> Now, we will be asking you questions not to pry into your personal affairs or to embarrass you, but to determine if you are unbiased and without preconceived ideas that might have an effect on the case. Please do not withhold any information in order to be seated on this particular jury.
> This is actually important, and I want to spend just a minute on this. Is that, don't worry about what we might think of your answer, don't worry about whether your answer is the right answer or the wrong answer. The reason why I am talking to you about this is it's natural for people that are in a formal setting like a courtroom, people who may not feel comfortable speaking in public, that they [c]ensor themselves in order not to embarrass themselves by giving an answer that they think we might regard as inappropriate. . . . We are asking you about the judicial system and we are trying to determine ultimately whether you can be fair and impartial. It might be that — I think most of you are fair people. But sometimes people may, because of their own personal experiences, not be able to be impartial in a particular kind of case. I don't know if this is that kind of case. But it's very important for you to be forthcoming with us about what you are actually feeling as you are being asked these questions.

In response to whether any prospective jurors had "any specialized training, education or work experience related to sexual offenders," six prospective jurors, including Juror 61, responded affirmatively. Juror 61 stated he had been a police officer with the King County Sheriff's Office for 25 years. The court then asked the prospective jurors if anything about their training, education, or work experience "would make it difficult for you to be fair and impartial in this case." Juror 61 responded, "Everything pertaining to the last [25] years in law enforcement investigations of hundreds of abuse cases."

7

In response to whether "anybody had received a community notification letter informing the community that a registered sex offender was moving into the neighborhood," 11 prospective jurors, including Juror 61, responded affirmatively. The court then asked, "[W]as there anybody who received the notice who felt extremely strongly about the fact that somebody was moving into the neighborhood that was a registered sex offender, so much so you actually thought you might want to move?" A number of jurors responded affirmatively. The trial court asked whether anyone who "answered that question in the affirmative . . . reacted very strongly to that information in a way that might somehow affect you as a juror in this case." In response, Juror 61 indicated his experience had "jaded" him "a little bit" and made him "a little cynical in my outlook and belief that . . . they are more likely . . . to band together and I need to watch out for these guys."

> JUROR NO. 61:    Over the last twenty-five years, I've worked with our sexual assault unit, both in writing the letters we send out to the public as well as attending all the meetings we have for the public. In the districts I patrolled, it was common practice that we go by the registered sex offender's homes and check on them as part of my daily work.
>
> THE COURT:    The question that I'd asked was whether this type of experience, exposure to registered sex offenders or hearing about registered sex offenders, elicited such a strong feeling that it might affect your ability to be fair and impartial in this case.
>
> JUROR NO. 61:    I would say yes, that has jaded me a little bit.
>
> THE COURT:    When you say it's jaded you, can you explain what that means.
>
> JUROR NO. 61:    I would say that the jading has made me a little cynical in my outlook and belief that, okay, they are more likely that they are going to band together and I need to watch out for these guys.
>
> THE COURT:    Thank you.

8

Jaeger moved for a mistrial. Jaeger argued Juror 61's statement that sex offenders "are more likely than not to re-offend" tainted the jury pool.

> You have a police officer who on several occasions has talked about his lengthy experience, his great knowledge and in this particular area and said that because of that great experience of twenty-five years of going and visiting sex offenders he believes they are more likely than not to re-offend, which is the question here. I don't think that bell can be unrung.

Contrary to Jaeger's assertion, the record shows Juror 61 never stated sex offenders are likely to reoffend. The court denied the motion for a mistrial. "It's one man's opinion. And I don't think that there's any indication that because . . . he has a certain opinion that he is jaded, that it so prejudices the case that Mr. Jaeger cannot receive a fair trial."

Before resuming voir dire with the jury venire, the parties identified several jurors, including Juror 61, to question outside the presence of the other jurors. During questioning, the court asked Juror 61 if he believed there was a likelihood that sex offenders would reoffend. Juror 61 answered, "Yes." The court asked Juror 61 if it would be difficult for him to "let go of whatever assumptions you might bring to this trial." Juror 61 said he "would not be able to." The court excused Juror 61 for cause.

Jaeger relies on Mach v. Stewart, 137 F.3d 630 (9th Cir. 1997), to argue the comments of Juror 61 tainted the jury pool and denied him the right to an impartial jury. Mach does not support his argument.

In Mach, the government charged Mach with sexual conduct with a minor. Mach, 137 F.3d at 631. During jury selection, a prospective juror said she had a psychology background, currently worked for child protective services, and had confirmed child sexual assault in every case where a client reported it. Mach, 137 F.3d at 631-32. The

9

juror repeatedly stated that in her three years as a social worker, she never found a case where a child lied about sexual assault. Mach, 137 F.3d at 632. The court denied the motion for a mistrial. Mach, 137 F.3d at 632.

The Ninth Circuit reversed. Mach, 137 F.3d at 634. The court held the juror's statements tainted the jury. The statements were "highly inflammatory and directly connected to Mach's guilt." Mach, 137 F.3d at 634. The juror's comments had an "expert-like" quality given the juror's years of experience and degree of certainty. Mach, 137 F.3d at 633. The court reversed because the outcome of the trial was "principally dependent on whether the jury chose to believe the child or the defendant." Mach, 137 F.3d at 634. The court concluded the juror's repetition of the statements created an especially high risk they would affect the jury's verdict. Mach, 137 F.3d at 633. The court held:

> Given the nature of [the juror]'s statements, the certainty with which they were delivered, the years of experience that led to them, and the number of times that they were repeated, we presume that at least one juror was tainted and entered into jury deliberations with the conviction that children simply never lie about being sexually abused.

Mach, 137 F.3d at 633.

Unlike in Mach, Juror 61 did not make repeated, confident assertions directly addressing the fundamental issue of whether Jaeger is a sexually violent predator. We conclude the trial court did not abuse its discretion in denying the motion for a mistrial.

10

For the first time on appeal, Jaeger argues the responses of Juror 117[2] and Juror 2[3] constitute "expert-like" opinion testimony that warranted a mistrial. But defense counsel did not object to the response of Juror 117 or Juror 2 and did not move for a mistrial. Jaeger's claim that he had a "standing objection" is not supported by the record. The standing objection Jaeger refers to did not occur until eight days later and was related to the extent the parties could inquire into the history of other SCC residents. We will not review a claim of error not raised in the trial court. RAP 2.5(a); State v. O'Hara, 167 Wn.2d 91, 97-98, 217 P.3d 756 (2009).

In a footnote, Jaeger claims manifest error affecting a constitutional right warrants review under RAP 2.5(a). Because Juror 117 and Juror 2 were excused, Jaeger cannot show "manifest" error within the meaning of RAP 2.5(a). See O'Hara, 167 Wn.2d at 99 ("manifest" requires showing of actual prejudice).

(2)  Motion for Mistrial During Opening Statement

Jaeger argues the trial court erred in denying his motion for mistrial after Juror 5 fainted during opening statement. The trial court has broad discretion in addressing irregularities that arise during trial. State v. Post, 118 Wn.2d 596, 620, 826 P.2d 172 (1992). The record supports the decision to deny the motion for a mistrial.

---

[2] In the context of the State's "very high burden" of proof beyond a reasonable doubt, Juror 117 stated:

> I worked in an institution a number of years ago, and we worked with a man that was a pedophile, serial abuser. And he was in the institution for two to three years at least. And I — while I was working with him I did talk with him occasionally and he was discharged, released from the hospital. And within that week he was found with a boy, little boy in the front seat of his car ready to commit again. To violate the little boy. So there has to be some protection for society without abusing the abuser.

[3] In response to defense counsel asking whether offenders are likely to reoffend, Juror 2 stated:

> A few years ago in conversation with a friend who is a deputy sheriff, he had said if someone, as a young person stealing cars, when they get older most likely won't be doing that and could quit. But he said when it's something sexual, that there is no cure for that. And I have always kind of held those feelings.

During opening statement, the prosecutor described how Jaeger "repeatedly acted out sexually in bizarre and deviant ways." The prosecutor described "deviant practices" that "Dr. Hoberman will put . . . into a psychological context for you." Juror 5 fainted.

After a brief recess, the court questioned Juror 5 outside the presence of the other jurors. Juror 5 explained why he fainted: "It's just the combination . . . of being in a courtroom and hearing some graphic details about the case." Juror 5 was "worr[ied] about it" and concerned it "might happen again." Nevertheless, Juror 5 told the court he could continue to serve as a juror in the case.

At the conclusion of the opening statements, the court excused all the jurors for the noon recess except Juror 5. In follow-up questioning, Juror 5 said he was "feeling fine at the moment." Juror 5 said he was able to pay attention during the opening statements and believed he could continue as a juror in the case.

Jaeger moved for a mistrial arguing the reaction of Juror 5 might "taint the other jurors." The court denied the motion for a mistrial. "[The jurors are] all individuals and they are all going to have their reactions."

Nothing in the record shows that Juror 5 fainting during opening statement tainted the other jurors. The trial lasted three weeks and we presume the jury followed the court's instructions. Nichols v. Lackie, 58 Wn. App. 904, 907, 795 P.2d 722 (1990). At the conclusion of trial, the court instructed the jury that the attorneys' remarks are not evidence and the jury must base its verdict on only the evidence presented at trial.

> The evidence that you are to consider during your deliberations consists of the testimony that you have heard from witnesses, and the exhibits that I have admitted, during trial. If evidence was not admitted or

12

was stricken from the record, then you are not to consider it in reaching your verdict.

. . . .

. . . You should disregard any remark, statement, or argument that is not supported by the evidence or the law as I have explained it to you.

. . . .

As jurors, you are officers of this court. You must not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, not on sympathy, bias, or personal preference. To assure that all parties receive a fair trial, you must act impartially with an earnest desire to reach a proper verdict.

The court did not abuse its discretion in denying the motion for a mistrial.

Evidentiary Rulings

Jaeger claims the trial court abused its discretion by (1) excluding expert testimony that he was prone to being victimized or groomed and (2) excluding evidence about the Department of Social and Health Services Community Protection Program (CPP).

We review evidentiary rulings for abuse of discretion. City of Auburn v. Hedlund, 165 Wn.2d 645, 654, 201 P.3d 315 (2009). Trial courts have discretion to consider the relevancy of evidence and balance the probative value of the evidence against prejudice. State v. Barry, 184 Wn. App. 790, 801, 339 P.3d 200 (2014). A trial court abuses its discretion when the decision is based on untenable grounds or is manifestly unreasonable. Broten, 130 Wn. App. at 336. An erroneous evidentiary decision requires reversal only if " 'it materially affected the outcome of the trial.' " State v. Beadle, 173 Wn.2d 97, 120-21, 265 P.3d 863 (2011) (quoting State v. Russell, 125 Wn.2d 24, 94, 882 P.2d 747 (1994)).

13

### (1) Exclusion of Victimization and Grooming Testimony

According to Dr. Natalie Brown, Jaeger's behavior could be explained by autism and fetal alcohol syndrome disorder (FASD). Dr. Brown planned to use PowerPoint during her testimony. One slide stated youth with FASD "are very susceptible to peer pressure, easily led, and prone to be victimized by other inmates." The State objected to a slide that used the phrase "prone to be victimized by other inmates" and to other slides containing similar themes.

Jaeger argued the evidence explained his behavior and was necessary to rebut the evidence that "he's going to fail in the community."

> We are bringing in — the State is bringing in all of Greg Jaeger's past behavior at the SCC as a reason why he's going to fail in the community.
> We are showing that there are all these things that he's gone through while at the SCC that have created, in large part, the behavior that he has done while at the SCC. That — we are not saying anything about what's going to happen if he's kept at the SCC.
> . . . We are talking about an explanation for his behavior.

The trial court sustained the State's objection because there had been no testimony of either victimization or grooming.

> I am going to strike the last clause, "and prone to being victimized by other inmates." There has been no testimony about that in this case. There has been testimony about sexual activity at the SCC, but I don't believe that that is relevant to this particular case, and we spent a lot of time on what the boundary is between legitimate inquiry as to what has happened at the SCC and which — and illegitimate, what we have referred to, I think, in shorthand form as "this is a bad place" as compared to living at home, which is not what is before the jury.
> So I am going to strike that clause and any similar language in any of the other slides.

The trial court acted within its discretion in sustaining the objection. There must be sufficient factual foundation for expert testimony for the testimony to be relevant. See, e g., State v. Kunze, 97 Wn. App. 832, 850 n.67, 988 P.2d 977 ("When an expert

desires to apply scientific knowledge to the facts of the particular case, his or her opinion must also, of course, rest on appropriate case related facts."). There was no evidence at trial that other SCC residents "victimized" or "groomed" Jaeger. To the contrary, the record showed Jaeger initiated consensual sexual relationships with other residents while detained at the SCC.

Further, in In re Detention of Turay, 139 Wn.2d 379, 404, 986 P.2d 790 (1999), the court held the "conditions at a particular [Department of Social and Health Services] facility . . . are irrelevant to the determination of whether a person fits within the statutory definition of [a sexually violent predator]." Jaeger attempts to distinguish Turay by arguing he did not directly challenge the conditions of the SCC. Jaeger contends Dr. Brown's testimony was relevant to show Jaeger's susceptibility to victimization and grooming was an explanation for his allegedly predatory behavior. The record supports the ruling that the testimony was essentially "shorthand" for conditions at the SCC.

In any event, Jaeger was able to make the argument that he is highly susceptible to victimization and grooming. Without objection, Dr. Brown testified that an individual with FASD is "very susceptible to peer pressure and easily led." Dr. Brown also testified at length that FASD made Jaeger "highly suggestible."

> [T]here have been others who have published research on suggestibility in this population [of individuals with FASD] as well.
> The reason why it's relevant to this particular case is because Mr. Jaeger is [a] very suggestible young man and prone to saying things, reporting information that might be affected by his suggestibility, might be affected by what he's heard other people say or suggest to him.
> So I don't rely on his self-report when I evaluated him. I didn't take anything he said at face value. And this is particularly problematic when you have a young man who is in treatment and he's hearing all these sexual stories and histories from other young people in treatment. There's some tendency to kind of adopt some of that as his own history. . . .
> . . . .

15

. . . This is a young man, who, according to my review of the records, is extremely open, tells on himself a lot, sometimes after the fact, but many times before the fact he will tell on himself. So I don't get a sense that he is deliberately lying but, rather, that he is either responding in terms of suggestibility to something that someone has suggested actually did occur, and he's incorporating that as his own memory, which is called confabulation. He is filling the gaps in his memory essentially with something that makes sense that he heard from somebody else.

### (2) Exclusion of Community Protection Program Evidence

Pretrial, Jaeger argued he was eligible for the CPP as a placement condition or voluntary treatment option on release under RCW 71.09.060(1).

The CPP is a state-funded program that provides 24-hour supervision of developmentally disabled individuals "who have committed serious crimes and served their prison time." In re Det. of Mulkins, 157 Wn. App. 400, 402, 237 P.3d 342 (2010). In addition to supervision, the CPP provides treatment and other support. "The program is voluntary and participants may refuse services and live without support or supervision." Mulkins, 157 Wn. App. at 402.

Jaeger presented evidence that he communicated regularly with CPP staff and intended to apply for the program after his release. But the evidence also showed his acceptance into the program was not certain. The regional coordinator testified that if released, Jaeger's acceptance into the CPP was "uncertain and essentially hypothetical."

The trial court excluded evidence of the CPP because it is not a condition that "would exist" upon Jaeger's release under RCW 71.09.060(1). RCW 71.09.060(1) states that in determining whether an individual is likely to engage in predatory acts of sexual violence, the jury may consider the existence of placement conditions and

16

voluntary treatment options that "would exist" if the person is unconditionally released.

> In determining whether or not the person would be likely to engage in predatory acts of sexual violence if not confined in a secure facility, the fact finder may consider only placement conditions and voluntary treatment options that <u>would exist</u> for the person if unconditionally released from detention on the sexually violent predator petition.

RCW 71.09.060(1).[4]

In <u>Mulkins</u>, we upheld the decision to exclude evidence that the CPP was a treatment option because there was no evidence the respondent "was actually accepted into . . . the program." <u>Mulkins</u>, 157 Wn. App. at 402.

> A respondent in a sexually violent predator . . . proceeding is not entitled to present evidence that he or she may be eligible to participate in the . . . CPP . . . unless the evidence establishes that this option would in fact exist for the respondent as a placement condition or voluntary treatment option upon an unconditional release. Here, the respondent failed to show that he was actually accepted into and agreed to participate in the program upon his release; he simply presented a letter indicating that he was a potential candidate for the program.

<u>Mulkins</u>, 157 Wn. App. at 401-02.

Here, as in <u>Mulkins</u>, there is no evidence Jaeger was "actually accepted" into the CPP. <u>Mulkins</u>, 157 Wn. App. at 402. Jaeger presented evidence only that "he was a potential candidate for the program." <u>Mulkins</u>, 157 Wn. App. at 402. The trial court did not abuse its discretion in excluding CPP evidence.

Jaeger argues that unlike in <u>Mulkins</u>, he is not seeking to show the CPP is a condition that would exist upon his release, but rather, that <u>applying</u> to the CPP is a condition that would exist upon his release. Below, Jaeger did not frame the argument in this way. His attorney argued evidence of the CPP was relevant because "[i]f Greg Jaeger can show via the CPP that he is not a danger to the community, then he does

_____

[4] Emphasis added.

not meet commitment criteria and he must be unconditionally released." Nonetheless, evidence that Jaeger "would apply" to the CPP has no bearing on whether the condition would exist or that he would actually be accepted into the program.

Even if the CPP evidence is not admissible under RCW 71.09.060(1), Jaeger asserts the statute violates his constitutional right to due process. In Mulkins, we considered and rejected the same argument and held the respondent did not have standing to challenge the constitutionality of the statute. Mulkins, 157 Wn. App. at 406-07.

> Mulkins asserts that the CPP is an existing option for him, relying on the letter from [the Department of Social and Health Services] and noting that offenders who have been identified by [the Department of Social and Health Services] as meeting the criteria for the program are notified by the form letter that was sent to him. But at most, this letter only indicated that he was identified as a potential candidate for the program and directed him to follow up with his case manager if he was interested in the program. Mulkins points to nothing else in the record establishing that he has in fact been through the application process, has been accepted as a suitable candidate for the program, and has agreed to participate in the program. Without further information about his actual placement in the program, Mulkins fails to establish that the CPP is an option that in fact "would exist" for him upon his release. Thus, even if evidence of the CPP were admissible under the statute, he fails to show that it would be admissible in his case. He therefore cannot demonstrate that, by excluding evidence of the CPP, RCW 71.09.060(1) applies to adversely affect his case. Accordingly, he lacks standing to challenge its constitutional validity.

Mulkins, 157 Wn. App. at 406-07. We adhere to the decision in Mulkins and conclude Jaeger does not have standing to challenge RCW 71.09.060(1).

Closing Argument

Jaeger argues four instances of prosecutorial misconduct during rebuttal argument violated his right to a fair trial.

We have applied the prosecutorial misconduct standard used in criminal cases to sexually violent predator cases. In re Detention of Law, 146 Wn. App. 28, 50-51, 204 P.3d 230 (2008).

To prevail on a claim of prosecutorial misconduct, Jaeger bears the burden of proving the comments were improper and prejudicial. State v. Yates, 161 Wn.2d 714, 774, 168 P.3d 359 (2007). Comments are prejudicial only if "there is a substantial likelihood the misconduct affected the jury's verdict." State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997).

The prejudicial effect of improper comments during closing argument must be viewed not in isolation, but "in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." Brown, 132 Wn.2d at 561. Where the defense fails to object to an improper remark during closing argument, error is waived unless the remark is "so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury." Brown, 132 Wn.2d at 561. A prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on the credibility of the witnesses based on the evidence. State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997). Remarks, even if improper, are not grounds for reversal if invited or provoked by defense counsel or are in pertinent reply unless the remarks are so prejudicial that a curative instruction would be ineffective. Russell, 125 Wn.2d at 86.

Jaeger's attorney argued in closing that the State did not prove beyond a reasonable doubt that "Jaeger is more likely than not — more than 50 percent likely —

19

to commit sexually violent predatory acts." Jaeger addressed the testimony of Dr. Kellaher and Dr. Brown at length. The attorney argued the testimony of Dr. Kellaher and Dr. Brown was more credible than the testimony of Dr. Hoberman. The attorney also argued that unlike Dr. Hoberman, Dr. Kellaher and Dr. Brown do not "rely on sexually violent predator cases for their livelihood."

Jaeger contends the prosecutor improperly disparaged Dr. Kellaher in rebuttal. In rebuttal, the attorney pointed out the discrepancy between Dr. Kellaher's written notes and her testimony.

> I confronted [Dr. Kellaher] with the contemporaneous notes, her hand-scrawled doctor notes of those interviews that she did with Mr. Jaeger. And what she had actually written when she was interviewing him and asking about his unwanted, intrusive thoughts that he couldn't control, she had written, "Mom dying and killing mom and dad. Suicide if parents dying."
> So there was kind of a mad scramble on redirect examination when she tried to explain that discrepancy. She said, "Oh, I just — I didn't have time to accurately write down what he had truly told me. What he told me was that he had been having unwanted thoughts about other people killing his parents." She said other people killing, she also said other people murdering his parents.
> Are you accepting that as an explanation? It doesn't make any sense. If that were true, even that would be of psychological significance, wouldn't it? Wouldn't she be expected to record that the unwanted thoughts were of somebody murdering his parents?
> She cleaned that. She scrubbed that. And she put it in her formal report. She disgraced herself in this courtroom by doing that.

Jaeger objected after the last comment that Dr. Kellaher "disgraced herself in this courtroom by doing that." The court sustained the objection. The comment was improper. State v. Monday, 171 Wn.2d 667, 677, 257 P.3d 551 (2011) (a prosecutor may not state a personal belief as to the credibility of a witness). But Jaeger cannot show a substantial likelihood that the comment affected the verdict. Jaeger also challenges comments in rebuttal contrasting the credentials of Dr. Hoberman and Dr.

20

Kellaher and the remark that Dr. Kellaher "fluff[ed] up a resumé." But Jaeger did not object to these remarks and cannot show prejudice that could not have been neutralized by a curative instruction to the jury.

Jaeger argues the prosecutor impermissibly shifted the burden of proof by arguing he did not rebut the State's evidence and did not call a witness to testify about the release plan. Because a defendant has no duty to present evidence, a prosecutor cannot argue the burden of proof rests with the defendant or "comment on the defendant's failure to present evidence." State v. Thorgersen, 172 Wn.2d 438, 453, 258 P.3d 43 (2011). However, a prosecutor is entitled to point out the improbability or lack of evidentiary support for the defense theory of the case. Russell, 125 Wn.2d at 87. The "mere mention that defense evidence is lacking does not constitute prosecutorial misconduct or shift the burden of proof to the defense." State v. Jackson, 150 Wn. App. 877, 885-86, 209 P.3d 553 (2009). And a prosecutor can "state that certain testimony is not denied, without reference to who could have denied it, and may comment that evidence is undisputed." State v. Morris, 150 Wn. App. 927, 931, 210 P.3d 1025 (2009).[5]

Here, the prosecutor argued, in pertinent part:

[T]he most glaring weakness in the defense case was their abject, complete refusal to face head on in any substantive way the enormous volume of evidence that the State presented in this case that establishes these tremendous sexual deviancies of Mr. Jaeger.
    Pedophilia, of course, being the most important, the diaper fetish being very important, but the coprophilia and urophilia.

The argument that the expert witness who testified on behalf of Jaeger did not address pedophilia, coprophilia, or urophilia did not improperly shift the burden of proof.

---

[5] Citation omitted.

21

Under the "missing witness" doctrine, a prosecutor can comment on the failure to call a witness where the defense:

> [F]ails to call a witness to provide testimony that would properly be a part of the case and is within the control of the party in whose interest it would be natural to produce that testimony, and the party fails to do so, the jury may draw an inference that the testimony would be unfavorable to that party.

State v. Cheatam, 150 Wn.2d 626, 652, 81 P.3d 830 (2003) (citing State v. Blair, 117 Wn.2d 479, 485-86, 816 P.2d 718 (1991)). The inference arises only where "the witness is peculiarly available to the party" and "within the party's power to produce," and "the testimony must concern a matter of importance." Cheatam, 150 Wn.2d at 652-53.

> The prosecutor noted Jaeger did not call Dr. Steve Becker.

> Dr. Becker, the one that they hired to give them a treatment plan, said you need to hire four outside staff members, three eight-hour shifts to watch him 24[ hours a day]/7[ days a week]. One is to sit outside the door even when he sleeps at night and to make sure that door doesn't open.
> That's what their professional, who wasn't called to testify, thinks about the risk that is posed by this person sitting in front of you. You all know what's sitting in front of you.

Noting the failure to call Dr. Becker was not improper. Jaeger's attorney told the jury during opening statement that Dr. Becker would testify about the release plan.

> Dr. Steve Becker is in charge of the training of the members of the support group. You will hear from him. He has been providing home-based parent training and behavior management services for over twenty-five years. He has served on the board of directors for the Autism Society in Washington. He has a twelve-year career as a special education teacher with developmental disabilities and impulses.
> You will hear from [Dr. Becker] about the comprehensive release plan.

Jaeger argues the attorney committed misconduct by arguing sexual deviancy enhances the "likelihood of reoffense."

> [A]s Dr. Hoberman testified, multiple paraphilias are a huge risk factor for enhanced risk of reoffense sexually.
> And that just comports with your common sense. The more deviant somebody is, the more they dwell on these various deviant practices and urges, the more sick they are, the greater likelihood of reoffense. That's the connection.

Jaeger contends that because the likelihood of reoffense must be connected to the type of mental abnormality and not simply the number of deviancies or the degree of the deviancy, the argument misstated the law. Jaeger also claims the prosecutor's statement relies on facts not in evidence.

The comments did not misstate the law. To meet the burden of proving that Jaeger meets the definition of "sexually violent predator," the State must prove he "suffers from a mental abnormality or personality disorder which makes [him] likely to engage in predatory acts of sexual violence." RCW 71.09.020(18). The attorney did not rely on facts that were not in evidence. The attorney accurately summarized Dr. Hoberman's testimony.[6]

Substantive Due Process

Jaeger argues his civil commitment violates substantive due process because juveniles are scientifically incapable of volitional control. Jaeger relies on Roper v.

---

[6] Dr. Hoberman testified, in pertinent part:

Q. What does the research indicate in terms of persons who are actually diagnosed with a paraphilic disorder relative to those who are not, in terms of risk of future reoffense?

A. Presence of a paraphilic disorder is associated with an increased risk of sexual offending.

Q. And the second is multiple paraphilias. What does the research indicate about persons who have multiple diagnosed sexual paraphilias?

A. It indicates that people who have more than one paraphilia or paraphilic disorder are, again, more likely to commit future sexual offenses, to reoffend.

Simmons, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), Graham v. Florida, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), and State v. O'Dell, 183 Wn.2d 680, 358 P.3d 359 (2015).

In Roper and Graham, the Supreme Court addressed whether imposition of harsh punishment for crimes committed by juveniles without taking into consideration lack of volitional control violates the Eight Amendment to the United States Constitution. Roper, 543 U.S. at 578; Graham, 560 U.S. at 82. In O'Dell, the Supreme Court held a trial court "must be allowed to consider youth as a mitigating factor when imposing a sentence on an offender." O'Dell, 183 Wn.2d at 696.

Unlike a criminal prosecution, a commitment proceeding does not raise an issue of cruel and unusual punishment under the Eight Amendment. And the Washington Supreme Court recently held that "a juvenile adjudication for a sexually violent offense is a predicate conviction for purposes" of the sexually violent predator statutes. In re Det. Anderson, 185 Wn.2d 79, 85, 368 P.3d 162 (2016).

Because a juvenile adjudication is only evidence and not a basis for punishment, and the inability to control sexual conduct while a juvenile is not relevant to his present or future inability to control behavior, Jaeger cannot show a violation of substantive due process. Although an individual must commit a crime of sexual violence to be civilly committed, the State must prove the individual is a sexually violent predator and the jury must find beyond a reasonable doubt that the individual currently "suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18).

Jaeger also claims a civil commitment is unconstitutional absent a finding that it is "highly probable" he will reoffend. The Washington Supreme Court considered and rejected this same argument in In re Detention of Brooks, 145 Wn.2d 275, 293-98, 36 P.3d 1034 (2001).

Cumulative Error

Jaeger argues cumulative error warrants reversal. Because the cumulative error doctrine "does not apply where the errors are few and have little or no effect on the outcome of the trial," we disagree. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

We affirm the jury verdict finding the State proved beyond a reasonable doubt that Jaeger is a sexually violent predator under chapter 71.09 RCW.

Schindler, J.

WE CONCUR:

Appelwick, J.

Becker, J.