**FILED**
**APRIL 5, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37676-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PHILLIP A. HAYES, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Phillip Alan Hayes appeals convictions for drive-by shooting,

reckless endangerment and reckless driving. He contends his trial lawyer provided

ineffective assistance of counsel by failing to move to sever the reckless driving charge

and by misstating the burden of proof in closing argument. He also assigns error to the

trial court's overruling of a defense objection to a police officer's opinion testimony and

the court's statement at sentencing that it would require Mr. Hayes to sell his Whitman

County property. The State concedes that for the trial court to require a property sale

would have been error, but points out that no such requirement was included in Mr.

Hayes's judgment and sentence or reduced to any other written order.

We find no error or ineffective assistance of counsel and affirm.

FACTS AND PROCEDURAL BACKGROUND

Phillip Hayes was convicted of several offenses taking place on a late winter

afternoon and early evening in 2020, which the State theorized were intended to

intimidate his rural neighbors, the Brown family. Mr. Hayes drove toward their farm

shop several times, firing shots, and later engaged in a reckless high-speed chase of a

vehicle he believed was associated with the Browns. We draw the following facts from

the evidence at trial, identifying Mr. Hayes's conduct as it was eventually charged.

The Brown family farms primarily in north Whitman County, near Lamont.

Charlie Brown operates the farm with his two adult sons, Rowdy Brown and Beau

Brown. For at least 10 years, there has been ill will between Mr. Hayes and the Browns.

The fact that Mr. Hayes's homestead of about 10 acres is located within and surrounded

on all sides by the Browns' farm has created occasions for conflict.

At around 3:30 p.m. on January 2, 2020, Rowdy[1] was working in the farm's shop,

which fronts on Spuler Road, when he saw Mr. Hayes's small green pickup truck drive

up Spuler Road, turn into the shop's driveway, remain for about 10 seconds, and back

out. It then drove slowly away toward Dewey Road, where it parked. To understand this

---

[1] We refer to Rowdy Brown by his first name for clarity, intending no disrespect.

2

and later events, it is helpful to visualize the parties' properties:



Ex. 103 (partial). The Brown shop and other farm buildings can be seen on the left-hand side of this aerial photograph. They sit a couple hundred yards north from Spuler's intersection with Dewey Road. Mr. Hayes's homestead can be seen at the bottom of the photograph, on Dewey Road.

Rowdy was concerned by Mr. Hayes's actions; he had not previously seen Mr. Hayes drive up Spuler Road. It becomes a dirt road shortly beyond the Browns' buildings and there are no other structures to the north. Mr. Hayes would not have been welcome at the shop. Rowdy took several pictures of Mr. Hayes's truck, which remained parked on Dewey Road within sight of the shop for several minutes before driving off. A local veterinarian, Jill Swannack, saw Mr. Hayes at the same Dewey Road location at

3

about 3:30 p.m., and observed that he was looking intently in the direction of the shop for a few minutes before leaving.

*Count 1 conduct*

At around 4:00 p.m., Rowdy got a text message from a friend who farms nearby, letting him know that Mr. Hayes was driving in the area. At around 4:30 p.m., before full darkness, Rowdy called Keith Pigott, a family friend from Lamont who is also a Washington State Patrol (WSP) trooper. Trooper Pigott was familiar with the strained Hayes/Brown relationship. The two men were discussing what Rowdy had seen when Rowdy saw Mr. Hayes's pickup driving up Spuler Road again, toward the shop. Trooper Pigott told Rowdy to call 911, start video recording, and keep his head down.

Rowdy took a series of videos from inside and outside the shop. The green pickup approached, then turned around and drove south toward Dewey Road, stopping a couple of times to fire a gun in the direction of the Browns' buildings. What Rowdy identifies as shots fired can be heard on his video recordings. According to him, he could tell that one shot hit something in the shop's yard. Rowdy and others later concluded that the shot struck and went through the right panel of the bed of Rowdy's pickup, hitting and denting but not passing through the panel on the other side. When Mr. Hayes drove off, Rowdy called 911 and again called Trooper Pigott.

4

*Count 2 conduct*

Shortly after 5:00 p.m., when it was fully dark and before help arrived, Rowdy saw headlights that he associated with Mr. Hayes's truck pull back onto Spuler Road. He again heard shots fired toward the farm buildings. He heard a shot strike something above, high on the shop building or a piece of equipment. The pickup drove off again. It was never determined what, if anything, was struck by these shots fired.

*Count 4 conduct*

Sergeant (Sgt.) Keith Cooper of the Whitman County Sheriff's Office arrived at the Browns' shop shortly thereafter. He spoke with Rowdy and called for additional deputies. He then drove his unmarked patrol vehicle—a dark Chevrolet Tahoe—to the intersection of Spuler and Dewey Roads to await backup. As he was waiting, a vehicle traveling on Dewey Road approached where Sgt. Cooper was parked, accelerated toward his driver's side door, and came to an abrupt stop so close to the door that the sergeant did not believe he would have been able to open it all the way. It was a small green truck with a black brush guard that he later identified as Mr. Hayes's. Unsure of the driver's identity and fearing for his safety, Sgt. Cooper drew his handgun but decided that a better course of action would be to drive away. He put his car in gear and drove away at a high rate of speed. The green truck followed closely, at speeds of up to 80 miles per hour on gravel roads. After several miles, Sgt. Cooper no longer saw the truck following him.

5

The Browns had owned a grey Chevrolet Tahoe up until the spring of 2019. Law enforcement theorized that the driver of the truck was Mr. Hayes, who assumed the parked car was associated with the Browns.

At around midnight that evening, law enforcement arrested Mr. Hayes at his home, transported him to the jail, and then executed a search warrant authorizing them to search his home and pickup truck. They seized several firearms, including a .44 Magnum revolver, from the home. When they unloaded the cylinder of the .44 revolver, it contained four live rounds and two spent shell casings. They seized live rounds and empty shell casings from the front seat area of Mr. Hayes's truck.

After the search was completed, Sgt. Cooper and Whitman County Sheriff Sgt. Michael Jordan met with Mr. Hayes at the sheriff's office and Hayes agreed to be interviewed. He denied chasing Sgt. Cooper's Tahoe or having anything to do with shooting toward the Browns' shop.

The next afternoon, Mr. Hayes told Sgt. Jordan he wanted to clarify that he had shot at a coyote from the roadway the day before, and those might have been the shots heard by Rowdy. Sgt. Cooper re-interviewed Mr. Hayes about this new information the night of January 3. Mr. Hayes explained that something had been killing his chickens, so when he saw a coyote the day before, he got in his truck to follow it and fired perhaps six shots in the area of the Browns' shop while attempting to kill it. He denied shooting at a pickup or that he would have vandalized anyone's property. He said he might have

6

followed Sgt. Cooper's car while driving to get his mail, but he was not trying to chase

him. Asked why he had not reported any of this when interviewed the night before, Mr.

Hayes said, "I was really drunk last night when you guys were talking to me." Report of

Proceedings (RP) at 537.

Mr. Hayes was eventually charged with two counts of drive-by shooting (counts 1

and 2), assault in the second degree (count 3) and reckless driving (count 4).

Before trial, the defense moved to sever the reckless driving count from the other

counts, arguing that Sgt. Cooper's "description of the truck combined with the deputy's

training and experience create a strong case of Reckless Driving." Clerk's Papers (CP) at

100. The defense was particularly concerned about the reckless driving count being tried

with the second degree assault count, which it argued "is weak especially on the element

of intent," and "[t]o allow these two disparate charges to proceed to trial together would

substantially prejudice Hayes." *Id.* The defense later withdrew its motion to sever when

the State declared it would not proceed to trial on the assault count.

At trial, the State called eight witnesses, including Rowdy, Trooper Pigott, Sgt.

Cooper, and veterinarian Swannack. It also called Brett Bromberg-Martin, a forensic

scientist with the WSP. The sole defense witness was Gaylan Warren, an independent

forensic examiner.

Sgt. Cooper testified to the matters recounted above and that on the evening of the

crimes he searched the Brown property for damage, and observed a bullet hole in the side

7

wall of the bed of Mr. Brown's truck. He photographed the damage the following day.

At trial, he identified three photographs he had taken (exhibits 153, 154 and 155), which

were admitted.

The prosecutor also sought to have Sgt. Cooper testify to the path the bullet was

traveling, to which the defense objected, resulting in the following voir dire, ruling, and

testimony:

> Q    Can you describe—do you see there what path the bullet was traveling? What direction?
>
> A    From the—
>
> [DEFENSE COUNSEL]: Objection—foundation, basis of knowledge.
>
> THE COURT: Do you have a little foundation, if you would please.
>
> BY [THE PROSECUTOR]:
>
> Q    Deputy, did you get a good look at it?
>
> A    Yes.
>
> Q    Did you see in what direction the metal was bent?
>
> A    Yes.
>
> [PROSECUTOR]: That's all I submit, Your Honor. That's all the foundation that's needed here.
>
> THE COURT: All right. You may proceed.
>
> BY [THE PROSECUTOR]:
>
> Q    So, Deputy, could you tell from that in what direction the—in what—yeah, in what direction the bullet was traveling?
>
> [DEFENSE COUNSEL]: Your Honor, if I might ask some questions to aid in my objection?
>
> THE COURT: All right.

[DEFENSE COUNSEL]: Deputy, do you know what a trajectory rod is?

THE WITNESS: Yes.

[DEFENSE COUNSEL]: What's the purpose of it?

THE WITNESS: To show direction of the bullet that traveled.

[DEFENSE COUNSEL]: So you get both the azimuth[2] and the degrees and both—all three dimensions, correct?

THE WITNESS: Correct.

[DEFENSE COUNSEL]: All right. Did you use one?

THE WITNESS: Nope.

[DEFENSE COUNSEL]: All right. Did you use some sort of laser directional?

THE WITNESS: No.

[DEFENSE COUNSEL]: So just in the bending of the metal, it could be quite a variance in the direction.

THE WITNESS: Based on my experience of shooting, I formed my opinion.

[DEFENSE COUNSEL]: That's not a question—answer though. So based—that's the reason we use those tools—forensics use those tools, is to get an accurate result and not just a guess, essentially, correct?

THE WITNESS: Correct.

[DEFENSE COUNSEL]: I have no other questions.

THE COURT: All right. Mr. [Prosecutor], you may continue.

[PROSECUTOR]: Thank you, Your Honor.

RP at 408-10.

---

[2] Defined to mean "horizontal direction expressed as the angular distance between the direction of a fixed point (such as the observer's heading) and the direction of the object." Merriam-Webster Online Dictionary (available at https://www.meriam-webster .com/dictionary/azimuth).

In continuing to question Sgt. Cooper about the bullet hole, the prosecutor qualified his question, saying, "I'm not asking for a precise angle—to make my question clear here." RP at 410. Directing the sergeant's attention to the photographs, he asked whether the bullet was coming from the front of the truck, its left side, or anywhere forward of the 90 degree angle to the right, to which Sgt. Cooper answered no. He then asked Sgt. Cooper to describe "approximately what direction that bullet was coming from," to which the sergeant answered it was from the taillight (apparently indicating the right taillight) going forward. RP at 411. Asked "what tells you that?," the sergeant answered, "The way the metal is ripped." *Id.* The sergeant testified that he considered the bending of the metal and the way the paint was chipped as indicators of the direction the bullet was traveling; when the prosecutor followed up by asking, "Again, not with precision—not a precise angle, but a general direction?," the sergeant answered, "Yes." RP at 412.

The prosecutor also questioned Sgt. Cooper about Rowdy's photo of a dent or depression of the metal on the inside wall of truck's bed, opposite the bullet hole but farther toward the forward end of the pickup.

Sgt. Cooper testified that he used Rowdy's video recordings to determine the approximate location of Mr. Hayes's pickup at the time of the shot that Rowdy believed hit something in the shop yard. Using a range finder, Sgt. Cooper testified the distance

10

from Mr. Hayes's truck to Rowdy's truck was approximately 355 yards. No bullet believed to have hit Rowdy's truck was ever found.

The State had engaged Mr. Bromberg-Martin, a firearms expert, to determine whether six empty shell casings recovered by Whitman County deputies from Mr. Hayes's truck had been fired from the revolver it seized in the search of Mr. Hayes's home. Mr. Bromberg-Martin testified that his testing confirmed they were fired from the revolver. He further testified that he had been able to determine from the empty shell casings by whom they were manufactured, and, using the manufacturer's specifications, testified that if the revolver had fired a live round, the speed of the bullet after a distance of 400 yards would have been approximately 850 feet per second. He testified that he was familiar with how bullets can impact sheet metal and, shown two photographs of what Sgt. Cooper had opined was the bullet hole in the Brown truck, testified it was "possible" it was indeed a bullet hole. RP at 468. He testified it was also "possible" the hole was caused by something else. *Id.*

When cross-examined by the defense, Mr. Bromberg-Martin testified that the crime lab could have determined with more certainty whether the hole was caused by a bullet by chemical testing for lead and copper residue or a stereo microscopic examination, neither of which was done.

The defense called Gaylan Warren, an independent examiner who had nearly 17 years of prior experience at the state crime laboratory. He testified that if the hole in

11

Rowdy's truck had been caused by a bullet, the bullet or a fragment of it should have been found. He had examined the photographs of Mr. Brown's truck and testified that if, as the State theorized, a bullet pierced the right panel of the truck's bed and then struck the left panel, the bullet would come to rest "in that space." RP at 584. When cross-examined by the prosecutor, Mr. Warren agreed that he had sometimes not found an intact bullet at a crime scene, but he had never not found evidence of bullets, such as fragments.

In closing argument, defense counsel questioned the lack of forensic evidence, the biases of the State's witnesses, and the presentation of the evidence. And at one point in his closing argument he said, "[I]t's not the Defense's job to—I'll say it this way. *It's the Defense's job to raise a doubt.* It's the State's burden to erase that doubt. That's the way the system works; that's what the Constitution requires. We call into question the State's case. And in doing so, the State has to respond with evidence and prove it." RP at 666 (emphasis added).

Of the charges that remained, the jury found Mr. Hayes guilty of count 1, the drive-by shooting charge related to Mr. Hayes's first round of firing, in which the State theorized the truck was hit. For the second round of firing, it found Mr. Hayes not guilty of drive-by shooting but guilty of the lesser included crime of reckless endangerment. It found him guilty of reckless driving.

At sentencing, the prosecutor asked the trial court to impose a geographical restriction that would prohibit Mr. Hayes from going within a half mile of any of the Browns' land, which he acknowledged would "require [Mr. Hayes] to move once he gets out of custody" and "would prohibit him from living there." RP at 705. He acknowledged it would be "a big step." RP at 708. He also discussed the possibility of a lesser geographical restriction that would restrict Mr. Hayes's travel on Spuler Road and east on Dewey Road.

Defense counsel agreed the court could put geographic restrictions and no-contact orders in place, but disputed that it could order Mr. Hayes out of his house of 23 years. Nevertheless, asking that any no-contact order allow Mr. Hayes to "get his property ready for sale if that's what he wants to do," defense counsel informed the court that selling the house once Mr. Hayes was released was "[h]is idea he just expressed to me," and something that might be "best for everybody." RP at 721. In allocuting, Mr. Hayes apologized for his actions and stated, "My intentions are—without any animosities whatsoever—I plan on moving out of there just as quick as I can get it fixed up and sold. And that is my word." RP at 726.

The trial court imposed a high end sentence of 20 months' confinement and 18 months' community custody for the drive-by shooting, suspended sentences for the remaining counts, restitution, and a 10 year no-contact order. It imposed geographical restrictions on Mr. Hayes's travel on Spuler Road and west on Dewey Road and observed

13

that having committed a felony, he would be prohibited from possessing firearms.  In announcing its sentence, it made inconsistent statements about whether it was going to require Mr. Hayes to sell his Whitman County property, at some points saying it would require it, but elsewhere stating "if I can say it, I'll say it in the no contact order."  RP at 731.

Toward the end of the sentencing, the prosecutor suggested that "the Court just simply order him not to go west of his property, as of a certain address on Dewey Road . . . from there and not go onto Spuler."  RP at 738.  As presented, signed, and filed, the several no-contact provisions of Mr. Hayes's judgment and sentence prohibit him from having contact with specific members of the Brown family, their spouses or children, prohibit him from coming onto the Browns' property or the property of any corporate entity controlled by the family, and state that he "may not go onto Spuler Rd., or Revere Rd., or onto Dewey Rd. west of 7181 Dewey Rd." for a period of 10 years.  CP at 323.

Mr. Hayes appeals.

## ANALYSIS

Mr. Hayes makes three assignments of error.  We begin with his assignment of error to the oral order requiring a sale of his Whitman County property, since it is most easily addressed.  We then turn to his claims of ineffective assistance of counsel and evidentiary error.

14

I.   MR. HAYES IS NOT SUBJECT TO ANY OPERATIVE ORDER TO SELL HIS WHITMAN
     COUNTY PROPERTY

Mr. Hayes challenges the trial court's authority to order him to sell his Whitman

County property. The State agrees that the trial court lacked authority to order such a

sale but argues that the operative no-contact order included in the judgment and sentence

does not include any such requirement.

A trial court's oral decision has no binding or final effect "unless it is formally

incorporated into findings of fact, conclusions of law, and judgment." *State v. Dailey*, 93

Wn.2d 454, 459, 610 P.2d 357 (1980). Oral statements are considered no more than "a

verbal expression of [a trial court's] informal opinion" at the time announced and may be

altered, modified or completely abandoned by the final written decision. *Ferree v. Doric

Co.*, 62 Wn.2d 561, 567, 383 P.2d 900 (1963).

That is the case here. The transcript of the sentencing hearing reveals that the

prosecutor asked that the no-contact provision of Mr. Hayes's judgment and sentence

include a geographical restriction; at its most extreme, one that would prevent Mr. Hayes

from living in his home. While the court stated that it would require a *sale* of the home

(after Mr. Hayes expressed an intention to sell it), the prosecutor ultimately proposed and

included a lesser geographical restriction in the judgment and sentence. It is only the

lesser geographical restriction in the judgment and sentence that is operative. Mr. Hayes

is not subject to a court order to sell his home.

15

II.     MR. HAYES FAILS TO DEMONSTRATE INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Hayes next contends that he received ineffective assistance of counsel when his trial lawyer (1) failed to move to sever the reckless driving count from the other charges and (2) misstated the burden of proof in closing argument.

The Washington and United States Constitutions guarantee a criminal defendant the right to the effective assistance of counsel. *See* CONST. art. I, § 22; U.S. CONST. amend. XIV, § 1; *see also State v. Sardinia*, 42 Wn. App. 533, 538, 713 P.2d 122 (1986). Effective assistance of counsel is required to ensure a fair and impartial trial. *State v. Thomas*, 109 Wn.2d 222, 225, 743 P.2d 816 (1987).

To demonstrate ineffective assistance, the defendant must show both that trial counsel's representation was deficient and the deficiency prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 117 (2009). To be deficient, representation must fall below an objective standard of reasonableness based on consideration of all the circumstances. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Conduct that can be characterized as "legitimate trial strategy or tactics" cannot serve as the basis for a claim of ineffective assistance of counsel. *State v. Prado*, 144 Wn. App. 227, 248, 181 P.3d 901 (2008). There is a strong presumption that trial counsel's performance was reasonable. *Id.*

16

Prejudice requires the defendant to demonstrate a "reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." *Kyllo*, 166 Wn.2d at 862 (citing *State v. Leavitt*, 111 Wn.2d 66, 72, 758 P.2d 982 (1988)). A reviewing court may address the prejudice prong initially "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice." *Strickland*, 466 U.S. at 697; *State v. Barbarosh*, 10 Wn. App. 2d 408, 415, 448 P.3d 74 (2019).

Whether trial counsel provided ineffective assistance is a mixed question of law and fact reviewed de novo. *Barbarosh*, 10 Wn. App. 2d at 414; *Strickland*, 466 U.S. at 698.

A.      *Failure to move for severance*

Joinder is proper under CrR 4.3(a) when two offenses are of the same character or are based on connected acts. Severance is appropriate if "the court determines that severance will promote a fair determination of the defendant's guilt or innocence of each offense." CrR 4.4(b). A trial court abuses its discretion in denying a motion to sever if "a trial involving both counts would be so manifestly prejudicial as to outweigh the concern for judicial economy." *State v. Bythrow*, 114 Wn.2d 713, 718, 790 P.2d 154 (1990). To determine whether to sever charges, a court considers "(1) the strength of the State's evidence on each count; (2) the clarity of the defenses as to each count; (3) court instructions to the jury to consider each count separately; and (4) the admissibility of

evidence of the other charges even if not joined for trial." *State v. Russell*, 125 Wn.2d 24, 63, 882 P.2d 747 (1994).

When trial counsel's failure to move to sever a count from other charges is the basis of an ineffective assistance claim, the prejudice prong must be demonstrated by showing "that a severance motion would likely have been granted," and second, "had a severance been granted, there is a reasonable probability that the jury would not have found [the defendant] guilty of [the remaining charges] beyond a reasonable doubt." *State v. Sutherby*, 165 Wn.2d 870, 884, 204 P.3d 916 (2009). The deficient representation prong must be demonstrated by showing there was no legitimate strategic or tactical reason for failing to make such a motion. *Id.* at 883-84. We conclude that it is easiest to dispose of this claim of ineffective assistance by addressing prejudice first.

Mr. Hayes contends on appeal that a severance motion would have been successful, arguing that two *Russell* factors presented a manifest danger of prejudice: he contends the evidence of reckless driving was much stronger than the evidence of the drive-by shooting charges, and evidence of the offenses would not have been cross admissible.[3]

We disagree as to both factors. Mr. Hayes characterizes the State's evidence of drive-by shooting as "much weaker" than its evidence of reckless driving, characterizing

---

[3] Mr. Hayes does not argue that there was a risk of confusion as to his defenses or that the jury was not properly instructed.

the former as amounting only to "the testimony of Mr. Brown, the videos he had taken, and the hole in his truck." Appellant's Opening Br. at 29. He argues that "[a]t its core, the case rested on the credibility of Mr. Brown," which he argues would have been in doubt, given his "motive to lie." *Id.* at 29-30. Not mentioned by Mr. Hayes is the corroboration of Rowdy's testimony. It was corroborated by Rowdy's contemporaneous conversations with Trooper Pigott, who suggested that Rowdy record what was going on; by the fact that Rowdy *did* start recording and the recordings themselves; by the observations of Dr. Swannack; and by Mr. Hayes's own eventual admission that he had been shooting in the area from his truck. There was no significant disparity in the strength of the evidence supporting the drive-by shooting and reckless driving counts.

He also argues that evidence of the offenses would not be cross admissible, arguing that no permitted purpose for the evidence existed between offenses whose only link was a "loose temporal one." *Id*. at 31. But the trial court had already found the evidence cross admissible, and Mr. Hayes fails to address its reasons why. Although Mr. Hayes's concern had been to sever the reckless driving charge from the later-dismissed second degree assault charge, the prosecutor asked the trial court to analyze the cross admissibility of the reckless driving and drive-by shooting evidence. *See* RP at 163-64. The trial court found that evidence of the reckless driving would be admissible in the prosecution of the drive-by shootings "because it shows the Defendant's state of mind very near to the time of the shootings—about an hour after the first set of shots and about

19

40 minutes after the second set of shots." RP at 165. It found the reckless driving evidence probative of Mr. Hayes's "intent to intimidate someone who he believed at this time to be associated with the victim Brown family," "absence of mistake or accident in the shootings that had just so recently occurred," and "relevant to prove the identity of the driver of the pick-up [sic] at the time of the shootings." RP at 166. The trial court reasonably found a close temporal relationship, not a loose one, and that the probative value of the evidence outweighed any prejudice.

Ineffective assistance of counsel is not shown by the failure to move to sever the reckless driving charge.

B. *Closing argument*

Mr. Hayes also argues that he was denied effective assistance of counsel because of defense counsel's statement that "[i]t's the Defense's job to raise a doubt" during closing argument. RP at 666.

The right to the effective assistance of counsel extends to closing arguments. *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003). As the United States Supreme Court pointed out in *Yarborough*, in which it reversed a Ninth Circuit Court decision that had deemed a defense closing argument to be ineffective assistance, "The Sixth Amendment [to the United States Constitution] guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight," and even when a

mistake is made, "relief is not automatic." *Id.* at 8. It quoted Justice (and former

Solicitor General) Robert Jackson's candid statement about argument:

> "I made three arguments of every case. First came the one that I
> planned—as I thought, logical, coherent, complete. Second was the one
> actually presented—interrupted, incoherent, disjointed, disappointing. The
> third was the utterly devastating argument that I thought of after going to
> bed that night."

*Id.* (quoting *Advocacy Before the Supreme Court*, 37 A.B.A.J. 801, 803 (1951)).

The defense has no duty to present evidence. *State v. Cheatam*, 150 Wn.2d 626,

652, 81 P.3d 830 (2003). It also has no *duty* to "raise a doubt" but when the opportunity

arises, that is surely a defense objective. To say it is "the defense's job to raise a doubt"

is not as problematic as saying it is "the defense's job to present evidence." And defense

counsel's challenged statement was made in the course of argument that correctly stated

the parties' respective burdens several times:

> And let's be clear—*there is no burden on the Defense to prove a thing.* We
> don't have—my job is to raise questions and ask questions—that's my job.
> I don't have to prove anything. I think I've proved by their own evidence
> that there was no reckless driving, but that's not the responsibility of the
> Defense.
> . . . .
> Count 1, we've got a hole we cannot say for sure how it got there. It
> was probably a bullet, yeah—I can admit that. It's probably a bullet and it
> probably came from his gun. But probably is not the State's burden, all
> right? Possibly. [Bromberg-]Martin says possibly—yep, it possibly could
> be; I agree with it possibly could be. That's not the State's burden to show
> it's possible. *The State's burden is to show what happened and they failed
> in that.*
> . . . .

Again, it's not the Defense's job to—I'll say it this way. *It's the Defense's job to raise a doubt.* It's the State's burden to erase that doubt. That's the way the system works; that's what the Constitution requires. We call into question the State's case. And in doing so, the State has to respond with evidence and prove it.

. . . .

[The State] is going to have a chance to go next because *the burden is on* [*the State*] *to prove each and every element beyond reasonable doubt*, so the State gets to go last.

RP at 663-66 (emphasis added).

We can agree with Mr. Hayes that the statement, "It's the Defense's job to raise a doubt" was improper. As Mr. Hayes argues, there is no legitimate defense strategy that supports shifting any part of the State's burden to the defense. But Mr. Hayes fails to demonstrate prejudice stemming from this single comment made during a summation that takes up 11 full pages of the verbatim report of proceedings. Viewed in the context of the entire closing argument and the jury instructions, there is no reason to believe that but for the misstatement, the outcome of the trial would have been different. Here again, Mr. Hayes fails to demonstrate prejudice.

III. SGT. COOPER'S "OPINION" TESTIMONY IS FAIRLY VIEWED AS LAY OPINION TESTIMONY, AND IT WAS NOT AN ABUSE OF DISCRETION TO ADMIT IT

The final assignment of error on appeal is to the trial court overruling the defense objection to the prosecution's solicitation of Sgt. Cooper's opinion about the direction traveled by the bullet that struck Rowdy's truck.

The admission of trial testimony is reviewed for abuse of discretion. *State v. Yates*, 161 Wn.2d 714, 762, 168 P.3d 359 (2007), *abrogated in part on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). If the reasons for admitting opinion evidence are "'fairly debatable,'" the trial court's exercise of discretion will not be reversed on appeal. *Walker v. Bangs*, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979).

By the time Sgt. Cooper testified, Rowdy and Trooper Pigott had both testified without objection that the hole located in the right rear quarter of Rowdy's pickup was a bullet hole. A bullet-sized hole is not commonly-occurring damage to a vehicle. Rowdy testified that he heard one of Mr. Hayes's shots hit something metal in the yard, and he testified there was "[no] doubt in [his] mind" there was no hole in his truck before the shots were fired. RP at 323. Contrary to one of Mr. Hayes's arguments on appeal, his trial lawyer never objected to Sgt. Cooper's testimony that the hole was a bullet hole.

Defense counsel's objection was, instead, to the State asking the sergeant's opinion as to the "direction the bullet was traveling." RP at 409. Defense counsel's voir dire established that Sgt. Cooper had not determined direction by using a trajectory rod, which the sergeant knew was used for that purpose, nor did he use a laser directional. When defense counsel asked the sergeant whether it was not true that "the reason . . . forensics use those tools, is to get an accurate result and *not just a guess*," Sgt. Cooper answered, "Correct." RP at 410 (emphasis added). The trial court overruled the

objection and allowed the sergeant to testify to his opinion of the direction of travel, which Sgt. Cooper said was based "on my experience of shooting." *Id.*

An expert witness may testify in the form of opinion or otherwise "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue [and the] witness qualifie[s] as an expert by knowledge, skill, experience, training, or education." ER 702. A lay opinion, by comparison, is admissible if it is "rationally based on the perception of the witness" and "not based on scientific, technical, or other specialized knowledge within the scope of rule 702." ER 701(a), (c). "Put another way, lay testimony must be based on 'knowledge . . . from which a reasonable lay person could rationally infer the subject matter of the offered opinion.'" *City of Seattle v. Levesque*, 12 Wn. App. 2d 687, 704, 460 P.3d 205 (2020) (alteration in original) (quoting *State v. Kunze*, 97 Wn. App. 832, 850, 988 P.2d 977 (1999)).

Sgt. Cooper's agreement that opining on a bullet's direction would be "just a guess" without using forensic tools would be a red flag if he had purported to offer an expert opinion on a precise direction. RP at 410. But the prosecutor asked in only broad terms about the direction from which the bullet approached. Sgt. Cooper's opinion was expressed in broad terms, and in lay opinion terms: he described and pointed out in photographs why he inferred from the bent metal of the hole and the dent on the opposite side of the truck's bed that the bullet came from the right rear of the truck, piercing the

right panel of its bed and striking the left panel at a location closer to the front of the truck. "The jury was therefore in a position to independently assess the opinion in light of the foundation evidence." *City of Seattle v. Heatley*, 70 Wn. App. 573, 581-82, 854 P.2d 658 (1993). Given the limited nature of the opinion offered by Sgt. Cooper, we find no abuse of discretion in the trial court's overruling the defense objection.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Pennell, J.